1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ronda N. Baldwin-Kennedy, Esq., SBN: 302813
**Law Office of Ronda Baldwin-Kennedy**
5627 Kanan Rd, Suite 614
Agoura Hills, CA 91301-3358
Telephone: 951-268-8977 / Fax: 702-974-0147

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

| | |
|---|---|
| WESTLAKE FITNESS LLC;ART GILFUS and DOES 1-1000, inclusive, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF VENTURA and ROBERT LEVIN, M.D., in his capacity as Health Officer for Ventura County <br><br><br> Defendants. | Case No. <br><br><br><br> **NOTICE OF REMOVAL BY UNITED STATES OF AMERICA [28  u.s.c. § 1442(a) (1)]** <br><br> **ATTACHMENT-  LIST OF PLEADINGS FROM STATE COURT CASE 56-2021-00549550-CU-MC-VTA** |

   PLEASE TAKE NOTICE that WESTLAKE FITNESS LLC; ART GILFUS and

DOES 1-1000, inclusive, Case 56-2021-00549550-CU-MC-VTA,

ATTACHMENT LIST OF PLEADINGS FROM STATE COURT CASE 56-2021-00549550-CU-MC-VTA

pending in the Superior Court of California for the County of Ventura , to the United States

District Court for the Central District of California pursuant to 28 U.S.C. § 1442(a)(1) is

removing the following pleadings from Superior Court of California, County of Ventura .

ATTACHMENT 1- NOTICE OF AND EX PARTE APPLICATION FOR TEMPORARY

RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF

PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS

AND AUTHORITIES; DECLARATIONS OF ROBERT LEVIN, M.D., SEAN JONES, ANNE

GUEVARRA, and CHRISTINE RENSHAW

ATTACHMENT 2- OPPOSITION TO EX PARTE APPLICATIN FOR TEMPORARY

RESTRAINING ORDER AND ORDER TO SHOW CASUSE RE ISSUANCE OF

PRELIMINARY INJUCTION; MEMORANDUM OF POINTS AND AUTHORITIES;

DECLARATIONS OF RONDA N. BALDWIN-KENNEDY IN SUPPORT OF OPPOSITION

THISEOF.

Respectfully submit,

Date: 01/27/2021

/S/ Ronda Baldwin Kennedy
_____
Ronda Baldwin Kennedy
Attorney for Plaintiffs

ATTACHMENT LIST OF PLEADINGS FROM STATE COURT CASE 56-2021-00549550-CU-MC-VTA

# ATTACHMENT 1

1 | MICHAEL G. WALKER. State Bar No. 150554
County Counsel, County of Ventura
2 | JACLYN SMITH, State Bar No. 274311
Assistant County Counsel
3 | CHRISTINE RENSHAW, State Bar No. 249618
Assistant County Counsel
4 | BRETT B. McMURDO, State Bar No. 293050
Assistant County Counsel
5 | 800 South Victoria Avenue, L/C #1830
Ventura, California 93009
6 | Telephone:   (805) 654-2580
Facsimile:   (805) 654-2185
7 | E-mail:      jaclyn.smith@ventura.org

8 | Attorneys for Plaintiffs County of Ventura
and Robert Levin, M.D., in His Capacity as
9 | Health Officer for Ventura County

VENTURA
SUPERIOR COURT
FILED

JAN 2 7 2021

MICHAEL D. PLANET
Executive Officer and Clerk
BY:_____, Deputy

JEANETTE FIMBRES

**(EXEMPT FROM FILING
FEES [Gov. Code, § 6103].)**

10 |

11 | SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

12 |

13 | COUNTY OF VENTURA and ROBERT )    No. 56-2021-00549550-CU-MC-VTA
LEVIN, M.D., in his capacity as Health )
14 | Officer for Ventura County,           )    Reservation No. 2548913
                                       )
15 |                    Plaintiffs,      )    REQUEST FOR JUDICIAL NOTICE IN
                                       )    SUPPORT OF EX PARTE
16 |            vs.                       )    APPLICATION FOR TEMPORARY
                                       )    RESTRAINING AND ORDER TO
17 | WESTLAKE FITNESS LLC; ART          )    SHOW CAUSE RE ISSUANCE OF
GILFUS; and DOES 1-1000, inclusive,    )    PRELIMINARY INJUNCTION
18 |                                     )
                    Defendants.         )    Date:    January 28, 2021
19 |                                     )    Time:    8:30 a.m.
                                       )    Ctrm:    40
20 |                                     )
                                       )    Judge:  Hon. Mark Borrell
21 | _____ )    Complaint filed: 1/19/2021

22 |

23 |        Pursuant to Evidence Code sections 452, subd. (b), (c), (d), (g) and (h), and 453,

24 | plaintiffs County of Ventura and Robert Levin, M.D., in his capacity as Health Officer for

25 | Ventura County (collectively, "Plaintiffs"), hereby request that this court take judicial

26 | notice of various executive orders and orders issued by the California Department of

27 | Public Health ("CDPH") and its State Public Health Officer, as well as a federal court

28 | / / /

1

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY
RESTRAINING AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

1  ruling and pertinent municipal code(s).  Plaintiffs request that the court take judicial
2  notice of the following matters:
3      1. Executive Order N-25-20, dated March 12, 2020, issued by Gavin Newsom,
4  Governor of California, a true and correct copy of which is attached hereto as Exhibit 1.
5      2. Executive Order N-33-20, dated March 19, 2020, issued by Gavin Newsom,
6  Governor of California, a true and correct copy of which is attached hereto as Exhibit 2.
7      3. "Blueprint for a Safer Economy" issued by CDHP, available at
8  <https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-
9  19/COVID19CountyMonitoringOverview.aspx>, a true and correct copy of which is
10  attached hereto as Exhibit 3.
11     4. "Blueprint for a Safer Economy – Activity and Business Tiers" issued by
12  CDHP, a true and correct copy of which is attached hereto as Exhibit 4.
13     5. "Covid-19 Industry Guidelines:  Fitness Facilities" issued by CDPH and dated
14  October 20, 2020, a true and correct copy of which is attached hereto as Exhibit 5.
15     6. The Statewide Public Health Officer Regional Stay-at-Home Order dated
16  December 3, 2020, a true and correct copy of which is attached hereto as Exhibit 6.
17     7. "Regional Stay at Home Order – Questions and answers:  Are gyms required to
18  close in regions where the Regional Stay at Home Order is in effect?," available online at
19  https://covid19.ca.gov/stay-home-except-for-essential-needs/#regional-stay-home-order, a
20  true and correct copy of which is attached hereto as Exhibit 7.
21     8. *Best Supplement Guide, LLC et al. v. Gavin Newsom, et al.,* U.S. District Court,
22  Eastern District of California, Case No. 2:20-cv-00965-JAM-CKD transcript regarding
23  October 27, 2020 City of Lodi, County of San Joaquin and State of California motion to
24  dismiss hearing, attached hereto as Exhibit 8.
25     9. Title 2, chapter 1, article 4 of the Thousand Oaks Municipal Code, which is
26  available online at
27  https://codelibrary.amlegal.com/codes/thousandoaks/latest/thousandoaks -ca/0-0'0-1294,
28  attached hereto as Exhibit 9.

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MICHAEL G. WALKER
County Counsel, County of Ventura

PDF signature

Dated:  January 27, 2021

By *Christine Renshaw*
CHRISTINE RENSHAW
Assistant County Counsel

Attorneys for Plaintiffs County of Ventura
and Robert Levin, M.D., in His Capacity as
Health Officer for Ventura County

3

# Exhibit 1

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

**EXECUTIVE ORDER N-25-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** despite sustained efforts, the virus remains a threat, and further efforts to control the spread of the virus to reduce and minimize the risk of infection are needed; and

**WHEREAS** state and local public health officials may, as they deem necessary in the interest of public health, issue guidance limiting or recommending limitations upon attendance at public assemblies, conferences, or other mass events, which could cause the cancellation of such gatherings through no fault or responsibility of the parties involved, thereby constituting a force majeure; and

**WHEREAS** the Department of Public Health is maintaining up-to-date guidance relating to COVID-19, available to the public at http://cdph.ca.gov/covid19; and

**WHEREAS** the State of California and local governments, in collaboration with the Federal government, continue sustained efforts to minimize the spread and mitigate the effects of COVID-19; and

**WHEREAS** there is a need to secure numerous facilities to accommodate quarantine, isolation, or medical treatment of individuals testing positive for or exposed to COVID-19; and

**WHEREAS**, many individuals who have developmental disabilities and receive services through regional centers funded by the Department of Developmental Services also have chronic medical conditions that make them more susceptible to serious symptoms of COVID-19, and it is critical that they continue to receive their services while also protecting their own health and the general public health; and

**WHEREAS** individuals exposed to COVID-19 may be temporarily unable to report to work due to illness caused by COVID-19 or quarantines related to COVID-19 and individuals directly affected by COVID-19 may experience potential loss of income, health care and medical coverage, and ability to pay for housing and basic needs, thereby placing increased demands on already strained regional and local health and safety resources such as shelters and food banks; and

**WHEREAS** in the interest of public health and safety, it is necessary to exercise my authority under the Emergency Services Act, specifically Government Code section 8572, to ensure adequate facilities exist to address the impacts of COVID-19; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8571 and 8572, do hereby issue the following order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1. All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19.

2. For the period that began January 24, 2020 through the duration of this emergency, the Employment Development Department shall have the discretion to waive the one-week waiting period in Unemployment Insurance Code section 2627(b)(1) for disability insurance applicants who are unemployed and disabled as a result of the COVID-19, and who are otherwise eligible for disability insurance benefits.

3. For the period that began January 24, 2020 through the duration of this emergency, the Employment Development Department shall have the discretion to waive the one-week waiting period in Unemployment Insurance Code section 1253(d) for unemployment insurance applicants who are unemployed as a result of the COVID-19, and who are otherwise eligible for unemployment insurance benefits.

4. Notwithstanding Health and Safety Code section 1797.172(b), during the course of this emergency, the Director of the Emergency Medical Services Authority shall have the authority to implement additions to local optional scopes of practice without first consulting with a committee of local EMS medical directors named by the EMS Medical Directors Association of California.

5. In order to quickly provide relief from interest and penalties, the provisions of the Revenue and Taxation Code that apply to the taxes and fees administered by the Department of Tax and Fee Administration, requiring the filing of a statement under penalty of perjury setting forth the facts for a claim for relief, are suspended for a period of 60 days after the date of this Order for any individuals or businesses who are unable to file a timely tax return or make a timely payment as a result of complying with a state or local public health official's imposition or recommendation of social distancing measures related to COVID-19.

6. The Franchise Tax Board, the Board of Equalization, the Department of Tax and Fee Administration, and the Office of Tax Appeals shall use their administrative powers where appropriate to provide those individuals and businesses impacted by complying with a state or local public health official's imposition or recommendation of social

distancing measures related to COVID-19 with the extensions for filing, payment, audits, billing, notices, assessments, claims for refund, and relief from subsequent penalties and interest.

7. The Governor's Office of Emergency Services shall ensure adequate state staffing during this emergency. Consistent with applicable federal law, work hour limitations for retired annuitants, permanent and intermittent personnel, and state management and senior supervisors, are suspended. Furthermore, reinstatement and work hour limitations in Government Code sections 21220, 21224(a), and 7522.56(b), (d), (f), and (g), and the time limitations in Government Code section 19888.1 and California Code of Regulations, title 2, sections 300-303 are suspended. The Director of the California Department of Human Resources must be notified of any individual employed pursuant to these waivers.

8. The California Health and Human Services Agency and the Office of Emergency Services shall identify, and shall otherwise be prepared to make available—including through the execution of any necessary contracts or other agreements and, if necessary, through the exercise of the State's power to commandeer property – hotels and other places of temporary residence, medical facilities, and other facilities that are suitable for use as places of temporary residence or medical facilities as necessary for quarantining, isolating, or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period.

9. The certification and licensure requirements of California Code of Regulations, Title 17, section 1079 and Business and Professions Code section 1206.5 are suspended as to all persons who meet the requirements under the Clinical Laboratory Improvement Amendments of section 353 of the Public Health Service Act for high complexity testing and who are performing analysis of samples to test for SARS-CoV-2, the virus that causes COVID-19, in any certified public health laboratory or licensed clinical laboratory.

10. To ensure that individuals with developmental disabilities continue to receive the services and supports mandated by their individual program plans threatened by disruptions caused by COVID-19, the Director of the Department of Developmental Services may issue directives waiving any provision or requirement of the Lanterman Developmental Disabilities Services Act, the California Early Intervention Services Act, and the accompanying regulations of Title 17, Division 2 of the California Code of Regulations. A directive may delegate to the regional centers any authority granted to the Department by law where the Director believes such delegation is necessary to ensure services to individuals with developmental disabilities. The Director shall describe the need justifying the waiver granted in each directive and articulate how the waiver is necessary to protect the public health or safety from the threat of COVID-19 or necessary to ensure that services to individuals with developmental disabilities are not disrupted. Any waiver granted by a directive shall expire 30 days from the date of its issuance. The Director may grant one or more 30-day extensions if the waiver continues to be necessary

to protect health or safety or to ensure delivery of services. The Director shall rescind a waiver once it is no longer necessary to protect public health or safety or ensure delivery of services. Any waivers and extensions granted pursuant to this paragraph shall be posted on the Department's website.

11. Notwithstanding any other provision of state or local law, including the Bagley-Keene Act or the Brown Act, a local legislative body or state body is authorized to hold public meetings via teleconferencing and to make public meetings accessible telephonically or otherwise electronically to all members of the public seeking to attend and to address the local legislative body or state body, during the period in which state or local public officials impose or recommend measures to promote social distancing, including but not limited to limitations on public events. All requirements in both the Bagley-Keene Act and the Brown Act expressly or impliedly requiring the physical presence of members, the clerk or other personnel of the body, or of the public as a condition of participation in or quorum for a public meeting are hereby waived.

In particular, any otherwise-applicable requirements that

(i)   state and local bodies notice each teleconference location from which a member will be participating in a public meeting;

(ii)   each teleconference location be accessible to the public;

(iii)   members of the public may address the body at each teleconference conference location;

(iv)   state and local bodies post agendas at all teleconference locations;

(v)   at least one member of the state body be physically present at the location specified in the notice of the meeting; and

(vi)   during teleconference meetings, a least a quorum of the members of the local body participate from locations within the boundaries of the territory over which the local body exercises jurisdiction

are hereby suspended, on the conditions that:

(i)   each state or local body must give advance notice of each public meeting, according to the timeframe otherwise prescribed by the Bagley-Keene Act or the Brown Act, and using the means otherwise prescribed by the Bagley-Keene Act or the Brown Act, as applicable; and

(ii)   consistent with the notice requirement in paragraph (i), each state or local body must notice at least one publicly accessible location from which members of the public shall have the right to observe and offer public comment at the public meeting, consistent with the public's rights of access and public comment otherwise provided for by the Bagley-Keene Act and the Brown Act, as applicable (including, but not limited to, the requirement that such rights of access and public comment be made available in a manner consistent with the Americans with Disabilities Act).

in addition to the mandatory conditions set forth above, all state and local bodies are urged to use sound discretion and to make reasonable efforts to adhere as closely as reasonably possible to the provisions of the Bagley-Keene Act and the Brown Act, and other applicable local laws regulating the conduct of public meetings, in order to maximize transparency and provide the public access to their meetings.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 12th day of March 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State

# Exhibit 2

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

**EXECUTIVE ORDER N-33-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

ALEX PADILLA
Secretary of State

# Exhibit 3

**COVID-19**

# Blueprint for a Safer Economy

California has a blueprint for reducing COVID-19 in the state with revised criteria for loosening and tightening restrictions on activities. Every county in California is assigned to a tier based on its test positivity and adjusted case rate for tier assignment. Additionally, a health equity metric took effect on October 6, 2020. In order to advance to the next less restrictive tier, each county will need to meet an equity metric or demonstrate targeted investments to eliminate disparities in levels of COVID-19 transmission, depending on its size. The California Health Equity Metric is designed to help guide counties in their continuing efforts to reduce COVID-19 cases in all communities and requires more intensive efforts to prevent and mitigate the spread of COVID-19 among Californians who have been disproportionately impacted by this pandemic.

## Updates as of 12/08/2020:

- CDPH continues to implement and operate the Blueprint For a Safer Economy under the emergency brakes action announced on November 9, 2020. Counties who are not currently under a regional Stay at Home Order may be moved to a more restrictive tier based on Blueprint data assessed each week. Once announced, the county is required to implement tier related restrictions by 11:59pm the next day.

- Thereafter, if a county enters into a regional Stay at Home Order based on ICU capacity, the restrictions associated with that order would take effect.

- In light of the recent, unprecedented surge in rate of increase of cases, notwithstanding the Blueprint framework outlined below, the following changes have been effective since 11/9/2020 and will stay in place until further notice:

  - Tier assignments may occur any day of the week and may occur more than once a week when CDPH determines that the most recent reliable data indicate that immediate action is needed to address COVID-19 transmission in a county.

  - Counties may be moved back more than one tier if CDPH determines that the data support the more intensive intervention. Key considerations will include the rate of increase in new cases and/or test positivity, more recent data as noted below, public health capacity, and other epidemiological factors.

  - The most recent reliable data will be used to complete the assessment.

- The California Blueprint Data Chart (Excel) has been updated to show county tier status, date of tier assignment, adjusted case rate for tier assignment, countywide test positivity, and the Health Equity quartile test positivity.

- County requests for tier adjudication will *not* hold the county in the current tier during adjudication, and given the current environment of rapidly escalating cases and widespread disease transmission across California, tier adjudication requests are unlikely to be approved unless unique, extreme circumstances and data are submitted justifying how the county is not impacted by the statewide increases.

## Additional information about the Blueprint:

- Find the status of activities in your county

- Understand which activities and businesses are open in the four tiers (PDF)

- Learn more about the California Health Equity Metric and the Targeted Equity Investment Plans from each county

- COVID-19 Health Equity Playbook for communities (PDF)

- County Tier Adjudication Request

- Explore the complete data by county - California Blueprint Data Chart (Excel)

- Find archived California Blueprint Data Charts

- Proyecto para una economía más segura | For other languages, visit our Multilingual Documents page

### Plan for Reducing COVID-19 and Adjusting Permitted Sector Activities to Keep Californians Healthy and Safe

This guidance outlines an updated framework for a safe progression of opening more businesses and activities in light of the pandemic. The framework for this guidance is informed by increased knowledge of disease transmission vulnerabilities and risk factors and is driven by the following goals:

1. To progress in phases based on risk levels with appropriate time between each phase in each county so impacts of any given change can be fully evaluated.

2. To aggressively reduce case transmission to as low a rate as possible across the state so the potential burden of flu and COVID-19 in the late fall and winter does not challenge our healthcare delivery system's ability to surge with space, supplies and staff. Also, with winter weather pushing more activities indoors, low levels of transmission in the community will make large outbreaks in these riskier settings less likely.

3. To simplify the framework and lay out clear disease transmission goals for counties to work towards.

## Tier Framework

This framework lays out the measures that each county must meet, based on indicators that capture disease burden, testing, and health equity. A county may be more restrictive than this framework. This framework also notes signals of concern, including impacted healthcare capacity that may lead towards a dimming intervention. This framework replaces the former County Data Monitoring metrics. As the COVID-19 pandemic continues to be an evolving situation and new evidence and understanding emerges, the California Department of Public Health (CDPH), in collaboration with other State officials, will continue to reassess metrics and thresholds.

See chart below for the framework metrics as set according to tiers based on risk of community disease transmission. Calculation of metrics is described in Appendix 1. Description of the Health Equity Metric can be found on the Health Equity Metric page.

Blueprint for a Safer Economy

| | Higher Risk ➝ of Community Disease Transmission*** | | ⬅ Lower Risk | |
| | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| **Measure** | | | | |
| **Adjusted Case Rate for Tier Assignment**<br><br>(Rate per 100,000 population* excluding prison cases^, 7 day average with 7 day lag) | >7 | 4-7 | 1-3.9 | <1 |
| **Testing Positivity^**<br><br>(Excluding prison cases^, 7 day average with 7 day lag) | >8% | 5-8% | 2-4.9% | <2% |

Metrics with values greater than or less than tier cut points by 0.05 are rounded up or down using conventional rounding rules.

^Excludes state and federal inmates, ICE facility residents, State Hospital inmates and US Marshal detainees

*Population denominators from the Department of Finance: State Population Projections - Total Population by County- Table P-1

**Case rate will be determined using cases confirmed by PCR

*** Counties are assigned a tier based on two metrics: test positivity and case rate. Large counties with populations greater than approximately 106,000 must also meet the health equity metric described on the Health Equity Metric page in order to advance to a less restrictive tier.

The case rate is adjusted based on testing volume per 100,000 population as described below. Due to variability in data, this adjustment does not apply to small counties (defined as those with a population less than 106,000 residents).

As counties focus on increased testing in their health equity quartiles and to support school openings, they are likely to experience an increased number of cases. We want to avoid disincentivizing increased testing, provided that test positivity is low and there is sufficient capacity for contact tracing and isolation. We are therefore increasing the adjustment for higher volume testing.

- For counties with testing volume above the state median, the factor is less than 1, decreasing in a linear manner from 1.0 to 0.5 as testing volume increases from the state median to 2x the state median. The factor remains at 0.5 if the testing volume is greater than 2x the state median.

- For counties with testing volume below the state median, the factor is greater than 1, increasing in a linear manner from 1.0 to 1.4 as testing volume decreases from the state median to zero. However, this adjustment for low testing volume will not be applied to counties with a test positivity < 3.5%.

**California COVID-19 Case Rate Adjustment Factor**

| Testing Volume | Case Rate Adjustment Factor* |
|---|---|
| 0 | 1.4 |
| 0.25* State Median | 1.3 |
| 0.50* State Median | 1.2 |
| 0.75* State Median | 1.1 |
| State Median | 1 |
| 1.25* State Median | 0.875 |
| 1.5* State Median | 0.75 |
| 1.75* State Median | 0.625 |
| 2.0*State Median and above | 0.5 |

- Counties with fewer than 106,000 residents, will be exempted from case rate adjustments, and counties with test positivity <3.5% will be exempted from adjustment for testing rates lower than the state median.

- If the two metrics are not within the same tier, the county's tier assignment will be determined by the more restrictive of the two.  For example, if a county's test positivity corresponds to tier 3 (orange, moderate), but the case rate corresponds to tier 1 (purple, widespread), the county will be assigned as tier 1. Movement will be determined by criteria described below.

## Moving through the Tiers

### Rules of the framework:

1. CDPH will assess indicators weekly on Mondays and release updated tier assignments on Tuesdays.

2. A county must remain in a tier for a minimum of three weeks before being able to advance to a less restrictive tier.

3. A county can only move forward one tier at a time, even if metrics qualify for a more advanced tier.

4. If a county's adjusted case rate for tier assignment and test positivity measure fall into two different tiers, the county will be assigned to the more restrictive tier.

5. The health equity metric is applied to jurisdictions with populations greater than 106,000. Rules of the health equity metric are described on the Health Equity Metric page.

6. City local health jurisdiction (LHJ) data will be included in overall metrics, and city LHJs will be assigned the same tier as the surrounding county

7. An LHJ may continue to implement or maintain more restrictive public health measures if the local health officer determines that health conditions in that jurisdiction warrant such measures.

8. Tier status goes into effect the Wednesday following each weekly tier assignment announcement on Tuesdays.

### To advance:

1. A county must have been in the current tier for a minimum of three weeks.

2. A county must meet criteria for the next less restrictive tier for both measures for the prior **two** consecutive weeks in order to progress to the next tier.

3. In addition, counties must meet the health equity criteria to demonstrate the county's ability to address the most impacted communities within a county.

**To move back:**

1. During the weekly assessment, if a county's adjusted case rate and/or test positivity has fallen within a more restrictive tier for two consecutive weekly periods, the state will review the most recent 10 days of data, and if CDPH determines there are objective signs of improvement the county may remain in the tier.  If the county's most recent 10 days data does not show objective signs of improvement the county must revert to the more restrictive tier. For subsequent weekly assessments, the above rules apply.

2. At any time, state and county public health officials may work together to determine targeted interventions or county wide modifications necessary to address impacted hospital capacity and drivers of disease transmission, as needed, including movement across more than one tier. Key considerations will also include the rate of increase in new cases and/or test positivity, more recent data as noted above, public health capacity, and other epidemiological factors.

3. Counties with a population less than 106,000 will have a small county criteria applied to it to ensure movement to a more restrictive tier is appropriate. Description of the small county framework is below.

4. Counties will have three days, beginning the Wednesday after tier assignments are announced on Tuesdays, to implement any sector changes or closures unless extreme circumstances merit immediate action.

## Small County Framework

Because California's case rate metric is normalized per 100,000 population, a number of counties with small populations have experienced large swings in their daily case rate as a result of a small number of newly reported cases. For some counties, this has raised the specter of needing to move back to a more restrictive tier despite overall disease stability and a demonstrated ability to trace, follow up with, investigate and support cases.

For example, once a small county is in yellow tier, a small number of cases – as low as 1 case per week for 2 consecutive weeks – could cause it to return to a more restrictive tier. While the overall proportion of cases may be the same as a larger county, the absolute number of cases is also an important consideration in gauging county capacity to control transmission through disease investigation, contact tracing and supportive isolation.

It is not in the interest of the public health of communities to close or restrict entire business sectors on the basis of such a small number of cases, and in some situations a small swing in week over week case counts can move a county from yellow tier all the way to purple tier. Because the state wants to avoid swift shifts in tier status based on small absolute case number changes, we are creating an alternate case assessment measure to apply to small counties. Small counties are defined as having fewer than 106,000 residents.[1]

**Alternate Case Assessment Measure.**  Small counties are subject to all existing Blueprint rules (test positivity thresholds, minimum duration of 3 weeks in a tier before moving to a less restrictive tier, inability to skip over a tier while moving from more restrictive to less restrictive tier designations, etc.) with the exception of the case rate thresholds as delineated below.

Case 2:20-cv-02153-JAM-CKD   Document 23-2   Filed 12/14/20   Page 88 of 154

This alternate case assessment measure provides small county protection against sudden tier changes as a result of small increases in cases.

For a small county that has test positivity that meets the threshold of that county's currently assigned tier, but is flagged for potentially moving to a more restrictive tier based on its weekly case rate assessment, the following criteria shall be applied in lieu of the Blueprint case rate thresholds.

If the county exceeds the following absolute weekly case numbers based on its population and tier for two consecutive weeks, it will be required to move to a more restrictive tier:

| Current Tier | Pop ≤ 35K | Pop 35K-70K | Pop 70K-106K |
|---|---|---|---|
| Yellow | 7 | 14 | 21 |
| Orange | 14 | 21 | 28 |
| Red | 35 | 42 | 49 |

### Movement into Yellow Tier

In moving from purple to red or red to orange tiers, small counties are subject to all existing Blueprint rules (test positivity thresholds, minimum duration of 3 weeks in a tier before moving to a less restrictive tier, inability to skip over a tier while moving from more restrictive to less restrictive tier designations, etc.).

For a small county to move from the orange to yellow tier, it must meet the existing test positivity threshold of less than 2%. However, in lieu of meeting the established daily case rate threshold for yellow tier of less than 1 case per 100,000, a small county is allowed to have a daily case rate of less than or equal to 2 cases per 100,000. Of note, these are the same parameters used for the health equity acceleration criteria to yellow tier.

[1] Twenty-two California counties have a population of less than 100,000. Sutter, which has a population of 106,000 is also included as it shares a health officer with Yuba County. Counties below this size have similar challenges and opportunities in controlling COVID-19 transmission and generally do not have major or large, densely populated cities. This distinction factors into how rapidly COVID-19 transmission can increase beyond households and the ability of the county to rapidly identify and contain outbreaks with existing contact tracing, isolation and quarantine resources.

## Risk Criteria

Activities and sectors will begin to open at a specific tier based on risk-based criteria (PDF), as outlined below. Lower risk activities or sectors are permitted sooner and higher risk activities or sectors are not permitted until later phases. Many activities or sectors may increase the level of operations and capacity as a county reduces its level of transmission.

### Criteria used to determine low/medium/high risk sectors

- Ability to accommodate face covering wearing at all times (e.g. eating and drinking would require removal of face covering)
- Ability to physically distance between individuals from different households

- Ability to limit the number of people per square foot

- Ability to limit duration of exposure

- Ability to limit amount of mixing of people from differing households and communities

- Ability to limit amount of physical interactions of visitors/patrons

- Ability to optimize ventilation (e.g. indoor vs outdoor, air exchange and filtration)

- Ability to limit activities that are known to cause increased spread (e.g. singing, shouting, heavy breathing; loud environs will cause people to raise voice)

## Schools

Schools may reopen for in-person instruction based on equivalent criteria to the July 17 School Re-opening Framework (PDF) previously announced. That framework remains in effect except that Tier 1 is substituted for the previous County Data Monitoring List (which has equivalent case rate criteria to Tier 1). Schools in counties within Tier 1 are not permitted to reopen for in-person instruction, with an exception for waivers granted by local health departments for TK-6 grades. Schools that are not authorized to reopen, including TK-6 schools that have not received a waiver, may provide structured, in-person supervision and services to students under the Guidance for Small Cohorts/Groups of Children and Youth.

Schools are eligible for reopening at least some in-person instruction following California School Sector Specific Guidelines once the county is out of Tier 1 (and thus in Tier 2) for at least 14 days, which is similar to being off the County Data Monitoring List for at least 14 days. The first day a county is considered in Tier 2 is the Wednesday after the weekly county tier assignments are announced and posted on the CDPH website (Tuesdays). For example, if a county is assigned to Tier 2 on Tuesday, October 13, the first full day the county is in Tier 2 is Wednesday, October 14. The county will have completed 14 days in Tier 2 on Tuesday, October 27 and may reopen schools for in-person instruction on Wednesday, October 28. As noted above, an LHJ may continue to implement or maintain more restrictive public health measures if the local health officer determines that health conditions in that jurisdiction warrant such measures.

As stated in the July 17 School Re-opening Framework (PDF), schools are not required to close if a county moves back to Tier 1, but should consider surveillance testing of staff. However, if a school or district had not already reopened for in-person instruction while in Tier 2 and is then moved to Tier 1, it may not reopen those schools until the county moves back to Tier 2 and remains in Tier 2 for 14 days.

## County Tier Adjudication Process

For more information, visit our County Tier Adjudication Request page.

## APPENDIX 1: Calculation of metrics

| Metric | Definition |
|--------|-----------|
|        |           |

| | |
|---|---|
| **Case Rate (rate per 100,000 excluding prison cases, 7-day average with 7-day lag)** | Calculated as the average (mean) daily number of COVID-19+ cases, this excludes: (a) persons out of state or with unknown county of residence and (b) persons incarcerated at state or federal prisons, ICE facilities, US Marshal only detention facilities or Department of State Hospitals (identified as cases with an ordering facility name or address associated with these locations), over 7 days (based on episode date), divided by the number of people living in the county/region/state. This number is then multiplied by 100,000. Due to reporting delays, there is a 7-day lag built into this calculation. For example, for data updated through 8/22/20, the case rate will be dated as 8/15/20 and will include the average case rate from 8/9/20 - 8/15/20. |
| **Linear adjusted case Rate per 100,000 per day, excluding prisoners (7-day average with 7-day lag)** | Calculated as the case rate multiplied by a case rate adjustment factor that is based on the difference between the county testing volume (testing volume, tests per 100,000 per day, described below) and the median county testing volume calculated across all counties. The median testing volume thus forms an anchor for this adjustment and is recalculated every four weeks to prevent undue fluctuation while remaining sensitive to evolving testing trends. For counties with a testing volume above the median, the adjustment factor is less than 1, decreasing in a linear manner from 1.0 to 0.5 as testing volume increases from the anchor point to 2x that value. The adjustment factor remains at 0.5 if the county testing volume is greater than 2x the state median. For counties with a testing volume below the state median, the adjustment factor is greater than 1, increasing in a linear manner from 1.0 to 1.4 as county testing volume decreases from the state median to zero. The linear adjustment formula can be expressed mathematically as follows: For counties testing above the state median: 1-(((county testing rate – state median testing rate)/state median testing rate) * 0.5) For counties testing below the state median:  1-(((county testing rate – state median testing rate)/state median testing rate) * 0.4) There are two conditions in which this formula is not applied. The first is small counties, those with a population less than approximately 100,000 based on CA Department of Finance population projections (see reference * in tier framework table). The small county exception prevents potential spurious adjustment due to fluctuations in testing influenced by secular events unrelated to underlying transmission risk. As a second condition for exception from the adjustment, counties with a testing volume below the state median and testing positivity < 3.5% are not adjusted, based on the assumption that volume of testing in these counties may not need to be as high with low test positivity. Under both these conditions, the adjusted case rate is equal to the unadjusted rate. |

| | |
|---|---|
| **Overall testing Positivity, excluding prisoners over 7-days (PCR only, 7-day lag)** | Calculated as the total number of positive polymerase chain reaction (PCR) tests for COVID-19 over a 7-day period (based on specimen collected date) divided by the total number of PCR tests conducted; this excludes tests for: (a) persons out of state or with unknown county of residence and (b) persons incarcerated at state or federal prisons, ICE facilities, US Marshal only detention facilities and Department of State Hospitals (identified as cases with an ordering facility name or address associated with prison/state hospitals locations). This number is then multiplied by 100 to get a percentage. Due to reporting delay (which may be different between positive and negative tests), there is a 7-day lag. <br><br> *Example:* For cumulative lab data received on 6/30/20, reported test positivity is dated as 6/23/20 and is calculated based on tests with specimen collection dates from 6/17-6/23 |
| **Tests per 100,000 per day, excluding prisoners (7-day average with 7-day lag)** | Calculated as the number of polymerase chain reaction (PCR) tests per day over a 7-day period (based on specimen collection date), excluding tests for persons incarcerated at state or federal prisons, ICE facilities, US Marshal only detention facilities and Department of State Hospitals  (identified as cases with an ordering facility name or address associated with prison/state hospitals locations), and divided by the number of people living in the county/region/state. This number is then multiplied by 100,000. Due to reporting delay, there is a 7-day lag included in the calculation. <br><br> Example: For cumulative lab data received through 8/22/20, the reported 7-day average number of tests will be dated as 8/15/20 and will include PCR tests with specimen collection dates from 8/9/20 - 8/15/20. |

*Data Source: CalREDIE*

## Helpful Links

- Find the status of activities in your county
- Understand which activities and businesses are open in the four tiers (PDF)
- Learn more about the California Health Equity Metric and the Targeted Equity Investment Plans from each county
- COVID-19 Health Equity Playbook for communities (PDF)
- County Tier Adjudication Request
- Explore the complete data by county (Excel)
- Find archived California Blueprint Data Charts
- School Re-opening Framework (PDF)
- Guidance for Small Cohorts/Groups of Children and Youth
- www.covid19.ca.gov
- Proyecto para una economía más segura | For other languages, visit our Multilingual Documents page

Case 2:20-cv-02153-JAM-CKD   Document 23-2   Filed 12/14/20   Page 92 of 154

Page Last Updated : December 13, 2020

# Exhibit 4

# Blueprint for a Safer Economy

## Activity and Business Tiers

| SECTORS | Widespread<br>Tier 1 | Substantial<br>Tier 2 | Moderate<br>Tier 3 | Minimal<br>Tier 4 |
|---|---|---|---|---|
| **Critical Infrastructure** | Open<br>with modifications | Open<br>with modifications | Open<br>with modifications | Open<br>with modifications |
| **Gatherings\*** | Outdoor gatherings only<br>with modifications<br>• Max 3 households | Indoor gatherings strongly<br>discouraged, allowed with<br>modifications<br>• Max 3 households | Indoor gatherings strongly<br>discouraged, allowed with<br>modifications<br>• Max 3 households | Indoor gatherings strongly<br>discouraged, allowed with<br>modifications<br>• Max 3 households |
| **Limited Services** | Open<br>with modifications | Open<br>with modifications | Open<br>with modifications | Open<br>with modifications |
| **Outdoor Playgrounds &<br>Outdoor Recreational<br>Facilities \*\*** | Open<br>with modifications | Open<br>with modifications | Open<br>with modifications | Open<br>with modifications |
| **Hair Salons & Barbershops** | Open Indoors<br>with modifications | Open indoors<br>with modifications | Open indoors<br>with modifications | Open indoors<br>with modifications |

1

| SECTORS | Widespread<br>Tier 1 | Substantial<br>Tier 2 | Moderate<br>Tier 3 | Minimal<br>Tier 4 |
|---|---|---|---|---|
| **All Retail** (including critical infrastructure, except standalone grocers) | Open Indoors<br>with modifications<br>• Max 25% capacity | Open Indoors<br>with modifications<br>• Max 50% capacity | Open Indoors<br>with modifications | Open Indoors<br>with modifications |
| **Shopping Centers (Malls, Destination Centers, Swap Meets)** | Open Indoors<br>with modifications<br>• Max 25% capacity<br>• Closed common areas<br>• Closed food courts | Open indoors<br>with modifications<br>• Max 50% capacity<br>• Closed common areas<br>• Reduced capacity food courts (see restaurants) | Open indoors<br>with modifications<br>• Closed common areas<br>• Reduced capacity food courts (see restaurants) | Open Indoors<br>with modifications<br>• Reduced capacity food courts (see restaurants) |
| **Personal Care Services\*\*\*** | Open Indoors<br>with modifications | Open indoors<br>with modifications | Open indoors<br>with modifications | Open indoors<br>with modifications |
| **Museums, Zoos, and Aquariums** | Outdoor Only<br>with modifications | Open indoors<br>with modifications<br>• Indoor activities max 25% capacity | Open indoors<br>with modifications<br>• Indoor activities max 50% capacity | Open indoors<br>with modifications |

2

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| **Places of Worship** | Outdoor Only with modifications | Open indoors with modifications <br>• Max 25% capacity or 100 people, whichever is fewer | Open indoors with modifications <br>• Max 50% capacity or 200 people, whichever is fewer | Open indoors with modifications <br>• Max 50% capacity |
| **Movie Theaters** | Outdoor Only with modifications | Open Indoors with modifications <br>• Max 25% capacity or 100 people, whichever is fewer | Open indoors with modifications <br>• Max 50% capacity or 200 people, whichever is fewer | Open indoors with modifications <br>• Max 50% capacity |
| **Hotels and Lodging** | Open with modifications | Open with modifications <br>• +Fitness centers (+10%) | Open with modifications <br>• +Fitness centers (+25%) <br>• +Indoor pools | Open with modifications <br>• +Fitness Centers (50%) <br>• +Spa facilities etc. |
| **Gyms and Fitness Centers** | Outdoor Only with modifications | Open indoors with modifications <br>• Max 10% capacity <br>• +Climbing walls | Open indoors with modifications <br>• Max 25% capacity <br>• +Indoor pools | Open indoors with modifications <br>• +Saunas <br>• +Steam rooms <br>• Max 50% capacity |

3

| SECTORS | Widespread<br>Tier 1 | Substantial<br>Tier 2 | Moderate<br>Tier 3 | Minimal<br>Tier 4 |
|---|---|---|---|---|
| Restaurants | Outdoor Only<br>with modifications | Open indoors<br>with modifications<br>• Max 25% capacity or 100 people, whichever is fewer | Open indoors<br>with modifications<br>• Max 50% capacity or 200 people, whichever is fewer | Open indoors<br>with modifications<br>• Max 50% capacity |
| Wineries | Outdoor Only<br>with modifications | Outdoor Only<br>with modifications | Open indoors<br>with modifications<br>• Max 25% capacity indoors, or 100 people, whichever is fewer | Open indoors<br>with modifications<br>• Max 50% capacity or 200 people indoors, whichever is fewer |
| Bars, Breweries, and Distilleries<br>(where no meal provided)<br>(follow restaurant guidance where meal is provided) | Closed | Closed | Open Outdoors<br>with modifications | Open indoors<br>with modifications<br>• Max 50% capacity |
| Family Entertainment Centers | Outdoor Only<br>with modifications<br>e.g.<br>• Kart Racing<br>• Mini Golf<br>• Batting Cages | Outdoor Only<br>with modifications<br>e.g.<br>• Kart Racing<br>• Mini Golf<br>• Batting Cages | Open Indoors for naturally distanced activities<br>with modifications<br>• Max 25% capacity<br>• Bowling Alleys | Open indoors for activities with increased risk of proximity and mixing<br>with modifications<br>• Max 50% capacity<br>• Arcade Games<br>• Ice and roller skating<br>• Indoor playgrounds |

4

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| **Cardrooms, Satellite Wagering** | Outdoor Only<br><br>with modifications | Outdoor Only<br><br>with modifications | Open indoors<br><br>with modifications<br>• Max 25% capacity | Open indoors<br><br>with modifications<br>• Max 50% capacity |
| **Offices** | Remote | Remote | Open indoors<br>with modifications<br>• Encourage telework | Open indoors<br>with modifications<br>• Encourage telework |
| **Professional Sports** | Open<br>• Without live audiences<br>• With modifications | Open<br>• Without live audiences<br>• With modifications | Open<br>• Without live audiences<br>• With modifications | Open<br>• Without live audiences<br>• With modifications |
| **Live Audience Sports\*\*\*** | Closed | Closed | Outdoors Only<br>• Max 20%<br>• Regional visitors (120 miles)<br>• Advanced reservations only<br>• Assigned seating only<br>• In-seat concessions only (No concourse sales) | Outdoors Only<br>• Max 25%<br>• Regional visitors (120 miles)<br>• Advanced reservations only<br>• Assigned seating only<br>• In-seat concessions only (No concourse sales) |

5

RJN - Exhibit 4
Page 5 of 6

| SECTORS | Widespread Tier 1 | Substantial Tier 2 | Moderate Tier 3 | Minimal Tier 4 |
|---|---|---|---|---|
| Amusement Parks*** | Closed | Closed | Smaller Parks Open<br>• 25% capacity or 500 people, whichever is fewer<br>• Outdoor attractions only<br>• In-county visitors only<br>• Advanced reservations only | Larger Parks Open<br>• 25% capacity<br>• Advanced reservations only |

*Gatherings updated November 13, 2020
**Outdoor playgrounds and outdoor recreational facilities updated September 28, 2020
***Personal care services, live audience professional sports and amusement parks updated October 20, 2020

6

RJN - Exhibit 4
Page 6 of 6

# Exhibit 5





# COVID-19 INDUSTRY GUIDANCE:

## Fitness Facilities

**October 20, 2020**

*This guidance is designed to address sectors and activities opening statewide. However, local health officers may implement more stringent rules tailored to local epidemiological conditions, so employers should also confirm relevant local opening policies.*



# OVERVIEW

On March 19, 2020, the State Public Health Officer and Director of the California Department of Public Health issued an order requiring most Californians to stay at home to disrupt the spread of COVID-19 among the population.

The impact of COVID-19 on the health of Californians is not yet fully known. Reported illness ranges from very mild (some people have no symptoms) to severe illness that may result in death. Certain groups, including people aged 65 or older and those with serious underlying medical conditions, such as heart or lung disease or diabetes, are at higher risk of hospitalization and serious complications. Transmission is most likely when people are in close contact or in a poorly ventilated area with an infected person, even if that person does not have any symptoms or has not yet developed symptoms.

Precise information about the number and rates of COVID-19 by industry or occupational groups, including among critical infrastructure workers, is not available at this time. There have been multiple outbreaks in a range of workplaces, indicating that workers are at risk of acquiring or transmitting COVID-19 infection. Examples of these workplaces include hospitals, long-term care facilities, prisons, food production, warehouses, meat processing plants, restaurants, and grocery stores.

As stay-at-home orders are modified, it is essential that all possible steps be taken to ensure the safety of workers and the public.

Key prevention practices include:

- ✓ physical distancing to the maximum extent possible,
- ✓ use of face coverings by workers (where respiratory protection is not required) and fitness facility patrons,
- ✓ frequent handwashing and regular cleaning and disinfection,
- ✓ training workers on these and other elements of the COVID-19 prevention plan.

In addition, it will be critical to have in place appropriate processes to identify new cases of illness in workplaces and, when they are identified, to intervene quickly and work with public health authorities to halt the spread of the virus.

2

# PURPOSE

This document provides guidance for fitness facilities to support a safe, clean environment for workers, customers, and the public. Businesses must identify and monitor the County Risk Level for the county the business is operating in and make required adjustments to their operations:

- **Purple – Widespread – Tier 1:** Only outdoor operations are permitted. Outdoor operations may be conducted under a tent, canopy, or other sun shelter as long as no more than one side is closed, allowing sufficient outdoor air movement. Outdoor pools can open. Outdoor hot tubs can open only for use by household groups or in cases where six feet of distancing can be maintained. Indoor pools, hot tubs, saunas, and steam rooms must remain closed. Gyms and fitness centers must follow this guidance.

- **Red – Substantial – Tier 2:** Indoor operations are permitted but must be limited to 10% capacity. Indoor pools, hot tubs, saunas, and steam rooms must remain closed. Gyms and fitness centers must follow this guidance.

- **Orange – Moderate – Tier 3:** Indoor operations are permitted but must be limited to 25% capacity. Indoor pools can open when physical distancing can be maintained for non-household groups. Indoor pools do <u>not</u> include any indoor water parks or water rides. Indoor hot tubs, saunas, and steam rooms must remain closed. Gyms and fitness centers must follow this guidance.

- **Yellow – Minimal – Tier 4:** Indoor operations are permitted but must be limited to 50% capacity. Indoor pools, hot tubs, saunas, and steam rooms can open but physical distancing must be maintained for non-household groups. Indoor pools do <u>not</u> include any indoor water parks or water rides. Gyms and fitness centers must follow this guidance.

For the most updated information on county status, visit <u>Blueprint for a Safer Economy</u>. Please note that local health departments can have more restrictive criteria and different closures. Find <u>your county's local information.</u>

**NOTE:** Fitness facilities may have a number of operational aspects and service offerings available in other guidance on the <u>Industry Guidance to Reduce Risk</u> website. Operators must review and adhere to the modifications in the guidance. Such operations include:

- Food service, snack or juice bars, and concessions (Restaurant guidance)
- Gift shops and retail operations (Retail guidance)
- Child care (Child Care guidance)
- Non-professional and amateur sports (Higher Education guidance)
- Youth sports (Youth Sports guidance)
- Outdoor recreation (Campgrounds, RV Parks, and Outdoor Recreation guidance)

3

- Janitorial or custodial services (Limited Services guidance)
- Outdoor playgrounds (see CDPH Outdoor Playground guidance)

The guidance is not intended to revoke or repeal any worker rights, either statutory, regulatory or collectively bargained, and is not exhaustive, as it does not include county health orders, nor is it a substitute for any existing safety and health-related regulatory requirements such as those of Cal/OSHA.[1] Stay current on changes to public health guidance and state/local orders, as the COVID-19 situation continues. Cal/OSHA has more safety and health guidance on their Cal/OSHA Guidance on Requirements to Protect Workers from Coronavirus webpage. CDC has additional for businesses and employers.

# Required Use of Face Coverings

On June 18, CDPH issued Guidance on the Use of Face Coverings, which broadly requires the use of face coverings for both members of the public and workers in all public and workplace settings where there is a high risk of exposure. Complete details, including all requirements and exemptions to these rules, can be found in the guidance.

The CDPH Face Covering Guidance is subject to additional updates based on the current scientific understanding of transmission of the virus causing COVID-19. Please check the CDPH website for any revisions.

4

 **Workplace Specific Plan**

- Establish a written, workplace-specific COVID-19 prevention plan at every facility, perform a comprehensive risk assessment of all work areas and work tasks, and designate a person at each facility to implement the plan.

- Incorporate the CDPH Face Covering Guidance into the Workplace Specific Plan and include a policy for handling exemptions.

- Identify contact information for the local health department where the facility is located for communicating information about COVID-19 outbreaks among workers or patrons.

- Train and communicate with workers and worker representatives on the plan and make the plan available to workers and their representatives.

- Regularly evaluate the workplace for compliance with the plan and document and correct deficiencies identified.

- Investigate any COVID-19 illness and determine if any work-related factors could have contributed to risk of infection. Update the plan as needed to prevent further cases.

- Implement the necessary processes and protocols when a workplace has an outbreak, in accordance with CDPH guidelines and orders or guidance from the local health department.

- Identify close contacts (within six feet for 15 minutes or more) of an infected worker and take steps to isolate COVID-19 positive worker(s) and close contacts.

- Notify all employees in writing, and employers of subcontracted employees, who may have been exposed to COVID-19 and report workplace outbreaks to the local health department. For additional information on employer responsibilities under AB 685 (Chapter 84, Statutes of 2020), refer to the Enhanced Enforcement and Employer Reporting Requirements from Cal/OSHA and the Employer Questions about AB 685 from CDPH.

- **For outdoor operations:** Establish an effective heat illness prevention plan with written procedures. See the Cal/OSHA heat illness prevention page for resources, including FAQs, a webinar, and a sample written plan. Elements of a heat illness prevent plan include:

  o  Access to water

  o  Access to shade

  o  Cool down breaks

5

- o   Emergency procedures for heat illness cases

- o   Monitoring of employees who are acclimatizing during a heat wave

- o   Training on heat illness prevention and symptoms

- Adhere to the guidelines below. Failure to do so could result in workplace illnesses that may cause operations to be temporarily closed or limited.



## Topics for Worker Training

- Information on COVID-19, how to prevent it from spreading, and which people are at higher risk for severe illness or death.

- Self-screening at home, including temperature and/or symptom checks using CDC guidelines.

- The importance of not coming to work:

  - o   If a worker has symptoms of COVID-19 as described by the CDC, such as a fever or chills, cough, shortness of breath or difficulty breathing, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea, vomiting, or diarrhea, OR

  - o   If a worker was diagnosed with COVID-19 and has not yet been released from isolation, OR

  - o   If, within the past 14 days, a worker has had contact with someone who has been diagnosed with COVID-19 and is considered potentially infectious (i.e. still on isolation).

- To return to work after a worker receives a COVID-19 diagnosis only after meeting CDPH Guidance on Returning to Work or School Following COVID-19 Diagnosis.

- To seek medical attention if their symptoms become severe, including persistent pain or pressure in the chest, confusion, or bluish lips or face. Updates and further details are available on CDC's webpage.

- The importance of frequent handwashing with soap and water, including scrubbing with soap for 20 seconds (or using hand sanitizer with at least 60% ethanol (preferred) or 70% isopropanol (if the product is inaccessible to unsupervised children) when workers cannot get to a sink or handwashing station, per CDC guidelines). Never use hand sanitizers with methanol due to its high toxicity to both children and adults.

- The importance of physical distancing, both at work and off work time (see Physical Distancing section below).

6

- Proper use of face coverings, including:

  o Face coverings are not personal protective equipment (PPE).

  o Face coverings do not replace the need for physical distancing and frequent handwashing.

  o Face coverings must cover the nose and mouth.

  o Workers should wash or sanitize hands before and after using or adjusting face coverings.

  o Avoid touching eyes, nose, and mouth.

  o Face coverings must not be shared and should be washed or discarded after each shift.

- Information contained in the <u>CDPH Guidance for the Use of Face Coverings</u>, which mandates the circumstances in which face coverings must be worn and the exemptions, as well as any policies, work rules, and practices the employer has adopted to ensure the use of face coverings. Training should also include the employer's policies on how people who are exempted from wearing a face covering will be handled.

- Heat illness symptoms and prevention following <u>Cal/OSHA requirements</u>.

- Ensure independent contractors, temporary, or contract workers at the facility are also properly trained in COVID-19 prevention policies and have necessary supplies and PPE. Discuss these responsibilities ahead of time with organizations supplying temporary and/or contract workers.

- Information on paid leave benefits the worker may be entitled to receive that would make it financially easier to stay at home. See additional information on <u>government programs supporting sick leave and workers' compensation for COVID-19</u>, including workers' sick leave rights under the <u>Families First Coronavirus Response Act</u>.



# Individual Control Measures and Screening

- Provide temperature and/or symptom screenings for all workers at the beginning of their shift and any vendors or contractors entering the facility. Make sure the temperature/symptom screener avoids close contact with workers to the extent possible.

- If requiring self-screening at home, which is an appropriate alternative to providing it at the establishment, ensure that screening was performed prior to the worker leaving the home for their shift and follows <u>CDC guidelines</u>, as described in the Topics for Worker Training section above.

7

- Encourage workers who are sick or exhibiting symptoms of COVID-19 to stay home.

- Employers must provide and ensure workers use all required protective equipment, including eye protection and gloves where necessary.

- Employers should consider where disposable glove use may be helpful to supplement frequent handwashing or use of hand sanitizer; examples are for workers who are screening others for symptoms or handling commonly touched items.

- Workers who consistently must be within six feet of patrons or co-workers must wear a secondary barrier (e.g., face shield or safety goggles) in addition to a face covering. All employees should minimize the amount of time spent within six feet of guests.

- Workers should wash hands on arrival at work, after working with each fitness facility member, after touching their face covering, after using the restroom, and when leaving work.

- If indoors, workers and patrons must wear face coverings at all times except when showering or swimming where indoor pools are allowed to open. Showering at home is encouraged where possible.

- The CDPH guidance exempts workers and patrons from wearing face coverings while engaged in exercise outdoors, as long as they are able to maintain a distance of at least six feet from others.

- If possible, implement a reservation system for the facility. Utilize the reservation system to contact patrons with reservations 24 hours before their scheduled arrival to confirm their reservation and ask if they or someone in their household is exhibiting any COVID-19 symptoms. If the patron answers in the affirmative the patron should be reminded that they should only utilize the fitness facility if they do not pose a health risk to other patrons or fitness facility workers. Such communication can be done via app, email, or text, if possible. Consider limiting the duration of use for patrons to accommodate more clients while maintaining capacity restrictions.

- Remind patrons in advance to bring a face covering, otherwise they should not be allowed to enter the premises unless exempted per the CDPH Face Covering Guidance. Consider making face coverings available for patrons who may arrive without them.

- Patrons should be temperature and/or symptom screened upon arrival and asked to use hand sanitizer and to wear face coverings in accordance with CDPH guidance. Operators have the right to cancel reservations for individuals/parties with symptomatic patrons and refuse entry.

8

- Fitness facilities must take reasonable measures, including posting signage at all entrances and in strategic and highly-visible locations, to remind workers and the public about the use of face coverings and the importance of practicing physical distancing.



# Ventilation, Cleaning, and Disinfecting Protocols

- Where possible, install portable high-efficiency air cleaners, upgrade the building's air filters to the highest efficiency possible, and make other modifications to increase the quantity of outside air and ventilation in offices and other spaces.

- Check the CDPH website periodically for updates on indoor air quality and ventilation guidance for airborne diseases in indoor settings.

- Evaluate the existing ventilation, cleaning, and disinfecting protocols for the fitness facility, including reception areas, locker rooms, restrooms, changing areas, and showers and update the protocols where necessary. Fitness facilities should be prepared to:

  o Clean HVAC intakes and returns daily.

  o Develop a detailed schedule and adjust or modify operating hours to provide adequate time for regular, thorough cleaning and disinfecting throughout the day.

  o Perform thorough cleaning throughout the day in high traffic areas, such as reception and lobby areas, changing rooms, locker rooms, and break rooms and areas of ingress and egress including stairways, stairwells, escalators, handrails, and elevator controls.

  o Frequently disinfect commonly used surfaces, including personal exercise machines and equipment, countertops, vending machines, doorknobs, and hand washing facilities.

  o Provide time for workers to implement cleaning practices during their shift. Cleaning assignments should be assigned during working hours as part of the workers' job duties.

  o Make sure all workers have been trained to use and have an adequate supply of all-purpose cleaners and disinfectants, when needed. Follow the complete CDC guidelines for cleaning and disinfection. Follow Cal/OSHA requirements and manufacturer instructions for safe use and required personal protective equipment for cleaning products.

  o Workers should have enough ventilation (air flow) in areas where

9

they are disinfecting. If cleaning in a bathroom or other small space, make sure the door and windows are propped open.

- o Workers should be supplied with first aid supplies, including bandages or other items to cover any cuts, scratches, or open wounds on skin and have sufficient supply to change the bandages often.

- o Patrons should be reminded to maintain six feet of distance from janitorial or custodial workers. Implement a process to regularly check in with workers to ensure visitors are following this protocol. Ensure workers are able to share such information without fear of reprisal or retaliation.

- o Procure options for third-party cleaning companies to assist with the increased cleaning demand, as needed.

- Equip entrances and exits, exercise machines, fitness rooms, changing rooms and locker rooms, and other areas with proper sanitation products, including hand sanitizer and sanitizing wipes, and provide personal hand sanitizers to workers who regularly engage with patrons (e.g., reception workers).

- Require patrons to disinfect individual exercise equipment, mats, and machines before and after use with provided disinfecting wipes. Ensure that lined, non-touch trash receptacles are available throughout the fitness facility to dispose of used wipes.

- If members are unable or unwilling to wipe/disinfect equipment after exercise, provide "ready to clean" tags for members to place on equipment after use, to ensure equipment is disinfected before the next use.

- Consider implementing a check-out system for patrons to utilize any small equipment and accessories (i.e. exercise bands, ropes, mats, foam rollers, etc.). Develop a process to clean and disinfect these items upon return.

- Follow CDC guidelines to ensure that all water systems are safe to use after a prolonged facility shutdown to minimize the risk of Legionnaires' disease and other diseases associated with water.

- Wherever possible, install touchless, automatic water dispensers for use with personal, reusable water bottles or single-use, disposable paper cups. Display signage reminding workers and patrons that the bottle or cup should not touch the water dispenser. If a touchless water dispenser is not feasible, remind workers and patrons to wash their hands or use proper hand sanitizer before and after touching the water release button on drinking fountains.

- Encourage patrons to bring their own towels and mats and consider disbanding the provision of any facility-provided towels or personal

hygiene products.

- For any towels, cloth wipes, or other laundered items that are used at the facility, follow <u>CDC guidelines</u> for those items. Provide a closed container where patrons can place used towels or other items. Ensure those items cannot be used again until properly laundered either by a commercial laundering service or a laundering process which includes immersion in water of at least 160 degrees Fahrenheit for at least 25 minutes. Store all clean linens in a clean, covered place. Ensure workers who handle dirty linens or laundry wear gloves.

- Workers and patrons should avoid shaking hands, bumping fists or elbows, and should maintain physical distance unless unavoidable. Workers should also avoid sharing tools, phones, electronics, and office supplies as much as possible and, where feasible, ensure workers have dedicated workstations for their personal use. Never share PPE.

- When choosing disinfecting chemicals, use products approved for use against COVID-19 on the <u>Environmental Protection Agency (EPA)-approved</u> list and follow product instructions. Use disinfectants labeled to be effective against emerging viral pathogens, diluted household bleach solutions (5 tablespoons per gallon of water), or alcohol solutions with at least 70% alcohol that are appropriate for the surface. Provide workers training on the chemical hazards, manufacturer's directions, ventilation requirements, and Cal/OSHA requirements for safe use. Workers using cleaners or disinfectants must wear gloves and other protective equipment as required by the product. Follow the <u>asthma-safer cleaning methods</u> recommended by the California Department of Public Health and ensure proper ventilation.

- Where possible, do not clean floors by sweeping or other methods that can disperse pathogens into the air unless all persons in the area have appropriate PPE. Use a vacuum with a HEPA filter wherever possible.

- Place signage throughout the fitness facility emphasizing basic infection prevention measures, including the importance of wearing face coverings and frequent handwashing.



# Physical Distancing Guidelines

- **WARNING**: physical distancing alone is insufficient to prevent transmission of COVID-19 and physical distances greater than six feet are recommended for high-exertion activities.

- Implement measures to ensure physical distancing of at least six feet between and among workers and patrons. This can include use of physical partitions or visual cues (e.g., floor markings, colored tape, or signs to indicate to where workers and/or patrons should stand during

11

check-in at reception areas or when waiting to use equipment).

- Space equipment at least six feet apart, with greater distancing for treadmills and other high-exertion aerobic fitness equipment. Equipment can be arranged in an "X" pattern to provide greater distancing. Physical barriers can also be helpful to minimize exposure between patrons or segregate exercise areas.

- Equip the front desk area with Plexiglas or other impermeable barriers, if feasible, to minimize the interaction between reception workers and patrons. Implement virtual, touchless check-in tools, if possible, so that patrons do not have to utilize the reception space.

- Consider implementing special hours designated for high risk or medically-vulnerable populations, including seniors with admittance by reservation only.

- For outdoor operations, establish an outdoor reception area where patrons can check in while still following physical distancing guidelines. Take measures at reception desks or other areas where physical distancing cannot be maintained to minimize exposure between workers and customers, such as Plexiglas or other barriers.

- For outdoor operations, create outdoor break areas with shade covers and seating that ensures physical distancing, where possible.

- Consider the following modifications to maintain physical distancing:

  o Implementing an online reservation-based system, as suggested in the Individual Control Measures and Screening section of this document, to avoid patrons queuing in the facility or outside and help maintain occupancy levels.

  o Permitting only those patrons that are actually exercising inside the facility. Patrons should not wait in the reception area.

  o Using one-way foot traffic patterns throughout the fitness facility with visual cues and signs.

  o Staggering available lockers in locker rooms to maintain physical distancing.

  o Spacing all equipment and machines at least six feet apart or taking some out of service to achieve physical distancing.

  o Adjusting personal training so that the exercise instructor maintains a minimum of six feet of physical distance.

  o Modifying group training classes to limit the class size to ensure a minimum of six feet of physical distance between patrons and/or move the classes outdoors or to larger spaces like full-sized basketball

12

courts, if possible. Group exercise classes should only be offered if distancing requirements can be maintained and there is no person-to-person physical contact.

- High contact programs that require close contact less than six feet in distance should be suspended. This would include activities such as group sporting events, organized intermural activities, pick-up basketball, or organized races.

- Adjust in-person meetings for workers, if they are necessary, to ensure physical distancing and use virtual options or smaller meetings at facilities to maintain physical distancing guidelines.

- Consider offering workers who request modified duties options that minimize their contact with patrons and other workers (e.g., managing administrative needs through telework).

- Stagger worker breaks, in compliance with wage and hour regulations, to maintain physical distancing protocols.

- Ensure workers can maintain physical distance in breakrooms, using barriers, increasing distance between tables/chairs to separate workers, etc. Where possible, create outdoor break areas with shade coverings and seating arrangements that ensures physical distancing. Discourage workers from congregating during breaks and ensure they are not eating or drinking without face coverings within six feet of each other.

 ## Additional Considerations for Communal Restroom and Shower Facilities

- Fitness facilities should consider staffing and other capacity and resource needs to ensure that locker rooms and shower facilities can be cleaned and disinfected regularly throughout the day.

- Shared restroom facilities and locker rooms should be cleaned regularly throughout the day using EPA-registered disinfectants. High-touch surfaces such as faucets, toilets, doorknobs, and light switches must be frequently cleaned and disinfected.

- Create and post a cleaning schedule for the restroom facilities and locker rooms. Post the cleaning schedule on the front of the door so patrons know when they can/cannot use the restroom and/or locker room. Make sure to close the restroom during the cleaning and disinfecting process.

- Consider using a checklist or audit system to track how often cleaning is conducted.

13

- Only allow shower and locker room use if partitions are in place or signs have been posted to specify physical distancing requirements. If partitions or proper distancing are not possible, these facilities should remain closed.

- Ensure that sanitary facilities stay operational and are continuously stocked at all times. Provide additional soap, paper towels, and hand sanitizer when needed. Install hands-free devices, if possible, including motion sensor sinks faucets, soap dispensers, sanitizer dispensers, and paper towel dispensers.

- Consider modifying doors to multi-stall restrooms to be able to be opened and closed without touching the handles, using opening-devices, or powered door operators with the hand, whenever possible. If the door cannot be opened without touching the handle or door-operator with the hand, place a trash-receptacle by the door to ensure a paper towel can be readily disposed of when operating the door. The location and positioning of waste receptacles should not interfere with egress, evacuation, emergency equipment, or any reasonable accommodations provided under the Americans with Disabilities Act. Make sure trash cans are emptied regularly.

- Provide information on how to wash hands properly, including hanging signs in restrooms.

 # Additional Considerations for Swimming Pools / Aquatic Venues

- Fitness facilities with swimming pools, splash pads, hot tubs, saunas, and steam rooms must take additional steps to ensure those facilities are properly cleaned and disinfected for patron use, according to CDC guidelines.

- Facilities with an openly accessible outdoor hot tub must ensure that at least six feet of distancing is maintained at all times between hot tub users not from the same household or limit its use to one household group at a time.

  o Patrons should remove face coverings while they are in the hot tub, due to the likelihood they will become wet, but must wear them as required when outside of the hot tub.

  o Facilities should provide a receptacle for collection of used towels for laundry, and clean and disinfect high touch surfaces regularly.

  o Post signage regarding distancing and face covering requirements.

14

- o Facility staff must monitor compliance with distancing requirements and, if it is not possible to consistently maintain distancing, must discontinue use of the hot tub.

- Hot tub operations with individual, private outdoor hot tubs for hire must limit their use to one household group at a time.

  - o Patrons should remove face coverings while they are in the hot tub, due to the likelihood they will become wet, but must wear them as required when outside of the hot tub.

  - o Post signage regarding face covering requirements.

  - o Between hot tub uses, operators should collect any used towels for laundry. Clean and disinfect high touch surfaces.

- For indoor pools, face coverings must be worn when out of the water or shower areas, unless exempt from the CDPH guidance. Cloth face coverings can be difficult to breathe through when they are wet. Face coverings should be put away when not in use so they are not accidentally touched or picked up by others.

- For outdoor pools, face coverings must be worn when out of the water, unless exempt under the CDPH guidance.

- Maintain proper disinfectant levels (1-10 parts per million free chlorine or 3-8 ppm bromine) and pH (7.2-8).

- Consult with the company or engineer that designed the aquatic venue to decide which List N disinfectants approved by the EPA are best for the aquatic venue. Ensure the safe and correct use and storage of disinfectants, including storing products securely away from children.

- Set up a system so that furniture and equipment (e.g., lounge chairs) that needs to be cleaned and disinfected is kept separate from furniture that has already been cleaned and disinfected. Label containers for used equipment that has not yet been cleaned and disinfected and containers for cleaned and disinfected equipment.

- Encourage patrons to bring and use their own towels wherever possible. If the facility is providing them, launder towels according to the

  manufacturer's instructions. Use the warmest appropriate water temperature and dry items completely. Handle towels with disposable gloves and minimal disturbance, i.e., do not shake them.

- Discourage people from sharing items, particularly those that are difficult to clean and disinfect or those that are meant to come in contact with the face (e.g., goggles, nose clips, and snorkels).

- Ensure that the facility has adequate equipment for patrons, such as kick

15

boards, pool noodles, and other flotation devices, to minimize sharing wherever possible. Clean and disinfect the items after each use.

- For indoor aquatic venues, introduce and circulate outdoor air as much as possible by opening windows and doors, using fans, or other methods. However, do not open windows and doors if doing so poses a safety risk to workers, patrons, or swimmers.

- Change the deck layout and other areas surrounding the pool to ensure that the standing and seating areas can support physical distancing requirements. This could include removing lounge chairs or taping off areas to discourage use.

- Provide physical cues or guides (e.g., lane lines in the water or chairs and tables on the deck) and visual cues (e.g., tape on the decks, floors, or sidewalks) and signs to ensure that workers, patrons, and swimmers stay at least six feet apart from one another, both in and out of the water.

- Where feasible, install impermeable physical barriers such as Plexiglas where workers and patrons must interact and physical distancing is difficult.

- Consider implementing reservations for pool use or implementing other mechanisms to support physical distancing. This could include reserving full-lanes for individual lap swimming, maintain swimmers in alternating lanes, and half-lanes for individual household use.

- Ensure that lifeguards who are actively lifeguarding are not also expected to monitor handwashing, use of cloth face coverings, or physical distancing. Assign this monitoring responsibility to another worker.

- Aquatic venues should avoid activities that promote group gatherings and should be aware of state and local policies on youth and adult sports and gathering requirements to determine if aquatic fitness classes, swim lessons, swim team practices, swim meets, or pool parties can be held.

- CDC's Model Aquatic Health Code has more recommendations to prevent illness and injuries at public pools in parks.

--------

[1]Additional requirements must be considered for vulnerable populations. Fitness facilities must comply with all Cal/OSHA standards and be prepared to adhere to its guidance as well as guidance from the Centers for Disease Control and Prevention (CDC) and the California Department of Public Health (CDPH). Additionally, employers must be prepared to alter their operations as those guidelines change.



# Exhibit 6



State of California—Health and Human Services Agency
# California Department of Public Health



SANDRA SHEWRY, MPH,MSW
*Acting Director*
ERICA S. PAN, MD,MPH
*Acting State Health Officer*

GAVIN NEWSOM
*Governor*

**Regional Stay At Home Order**
**12/03/2020**

Upon assessment of the recent, unprecedented rise in the rate of increase in COVID-19 cases, hospitalizations, and test positivity rates across California, the California Department of Public Health (CDPH) is taking immediate actions to prevent the spread of the virus.

The State, like the nation, continues to record an unprecedented surge in the level of community spread of COVID-19. California implemented an accelerated application of the Blueprint Framework metrics on November 16 and a limited Stay at Home Order issued on November 19. However, in the interim, the number of new cases per day has increased by over 112%, (from 8,743 to 18,588) and the rate of rise of new cases per day continues to increase dramatically. The number of new hospital admissions has increased from 777 on November 15, to 1,651 on December 2, and because of the lag between case identification and hospitalizations, we can only expect these numbers to increase.

Current projections show that without additional intervention to slow the spread of COVID-19, the number of available adult Intensive Care Unit (ICU) beds in the State of California will be at capacity in mid-December.  This is a sign that the rate of rise in cases, if it continues, is at risk of overwhelming the ability of California hospitals to deliver healthcare to its residents suffering from COVID-19 and from other illnesses requiring hospital care. ICU beds are a critical resource for individuals who need the most advanced support and care and the ability to add additional ICU capacity is limited by the lack of available ICU nurses and physicians as a result of the nationwide surge in hospitalizations and ICU admissions.

Because the rate of increases in new cases continues to escalate and threatens to overwhelm the state's hospital system, further aggressive action is necessary to respond to the quickly evolving situation. While vaccines are promising future interventions, they are not available to address the immediate risks to healthcare delivery in the current surge. The immediate aggressive institution of additional non-pharmaceutical public health interventions is critical to avoid further overwhelming hospitals and to prevent the need to ration care.

CDPH, MS 500 ●   P.O. Box 997377   ●   Sacramento, CA 95899-7377
(916) 558-1784
<u>Department Website</u> (www.cdph.ca.gov)



RJN- Exhibit 6
Page 1 of 4

**NOW, THEREFORE, I, as Acting State Public Health Officer of the State of California, order:**

1. CDPH will evaluate public health based on Regions, responsive to hospital capacity for persons resident in those Regions.

2. CDPH will evaluate the adult ICU bed capacity for each Region and identify on covid19.ca.gov any Regions for which that capacity is less than 15%. When that capacity is less than 15%, the following terms (the Terms of this Order) will apply.

   a. All gatherings with members of other households are prohibited in the Region except as expressly permitted herein.

   b. All individuals living in the Region shall stay home or at their place of residence except as necessary to conduct activities associated with the operation, maintenance, or usage of critical infrastructure,[1] as required by law, or as specifically permitted in this order.

   c. Worship and political expression are permitted outdoors, consistent with existing guidance for those activities.

   d. Critical infrastructure sectors may operate and must continue to modify operations pursuant to the applicable sector guidance.

   e. Guidance related to schools remain in effect and unchanged. Accordingly, when this Order takes effect in a Region, schools that have previously reopened for in-person instruction may remain open, and schools may continue to bring students back for in-person instruction under the Elementary School Waiver Process or Cohorting Guidance.

   f. In order to reduce congestion and the resulting increase in risk of transmission of COVID-19 in critical infrastructure retailers, all retailers may operate indoors at no more than 20% capacity and must follow the guidance for retailers. All access to retail must be strictly metered to ensure compliance with the limit on capacity. The sale of food, beverages, and alcohol for in-store consumption is prohibited.

   g. To promote and protect the physical and mental well-being of people in California, outdoor recreation facilities may continue to operate. Those facilities may not sell food or drink for on-site consumption. Overnight stays at

---

[1] See https://covid19.ca.gov/essential-workforce/ for full list of California's Critical Infrastructure workforce.

campgrounds are not permitted.

h. Nothing in this Order prevents any number of persons from the same household from leaving their residence, lodging, or temporary accommodation, as long as they do not engage in any interaction with (or otherwise gather with) any number of persons from any other household, except as specifically permitted herein.

i. Terms (a) and (b) of this section do not apply to persons experiencing homelessness.

3. Except as otherwise required by law, no hotel or lodging entity in California shall accept or honor out of state reservations for non-essential travel, unless the reservation is for at least the minimum time period required for quarantine and the persons identified in the reservation will quarantine in the hotel or lodging entity until after that time period has expired.

4. This order shall take effect on December 5, 2020 at 1259pm PST.

5. For Regions where the adult ICU bed capacity falls below 15% after the effective date of this order, the Terms of this Order shall take effect 24 hours after that assessment.

6. The Terms of this Order shall remain in place for at least three weeks from the date the order takes effect in a Region and shall continue until CDPH's four-week projections of the Region's total available adult ICU bed capacity is greater than or equal to 15%. Four-week adult ICU bed capacity projections will be made approximately twice a week, unless CDPH determines that public health conditions merit an alternate projection schedule.  If after three weeks from the effective date of the Terms of this Order in a Region, CDPH's four-week projections of the Region's total available adult ICU bed capacity is greater than or equal to 15%, the Terms of this Order shall no longer apply to the Region

7. After the termination of the Terms of this Order in a Region, each county within the Region will be assigned to a tier based on the Blueprint for a Safer Economy as set out in my August 28, 2020 Order, and the County is subject to the restrictions of the Blueprint appropriate to that tier.

8. I will continue to monitor the epidemiological data and will modify this Regional Stay-at-Home Order as required by the evolving public health conditions. If I determine that it is necessary to change the Terms of this Order, or otherwise modify the Regional Stay-at-Home Order, these modifications will be posted at covid19.ca.gov.

9.  When operative in a Region, the Terms of this Order supersede any conflicting terms in other CDPH orders, directives, or guidance. Specifically, for those Regions with ICU bed capacity triggering this order, the Terms of this Order shall supersede the State's Blueprint for a Safer Economy and all guidance (other than guidance for critical infrastructure sectors) during the operative period. In all Regions that are not subject to the restrictions in this order, the Blueprint for a Safer Economy and all guidance shall remain in effect.

10. This order is issued pursuant to Health and Safety Code sections 120125, 120130(c), 120135, 120140, 120145, 120175,120195 and 131080; EO N-60-20, N-25-20, and other authority provided for under the Emergency Services Act; and other applicable law.

_Erica S. Pan_

Erica S. Pan, MD, MPH
Acting State Public Health Officer
California Department of Public Health

# Exhibit 7



12/14/2020                    About COVID-19 restrictions - Coronavirus COVID-19 Response

All individuals living in the State of California are currently ordered to stay home or at their place of residence, except for permitted work, local shopping or other permitted errands, or as otherwise authorized (including in the Questions and answers below).

**State orders in place:**

- **Stay Home Order**
- **Blueprint for a Safer Economy**
- **Limited Stay Home Order**
- **Regional Stay Home Order — NEW**

# Stay Home Order

On March 19, 2020, an Executive Order (PDF) and Public Health Order (PDF) directed all Californians to stay home except to go to an essential job or to shop for essential needs. It was modified on May 4, 2020.

# Blueprint for a Safer Economy

On August 28, 2020, the State released the Blueprint for a Safer Economy to permit gradual reopening of certain businesses and activities.

# Limited Stay Home Order

**Order?**Case 2:20-cv-02153-JAM-CKD   Document 23-2   Filed 12/14/20   Page 109 of 154

### Who will be responsible for enforcing the Regional Stay Home Order?                                          +

### Under what authority is the Regional Stay Home Order being done?                                             +

### Where can I get resources or information to help encourage those in my community to adhere to this Regional Stay Home Order?                                          +

### Are gyms required to close in regions where the Regional Stay Home Order is in effect?                        −

Gyms in counties in a region that is impacted by the order must stop indoor operations. Outdoor gyms meet the essential workforce definition of an outdoor recreational facility for the purpose of facilitating personal health through physically distanced outdoor exercise and may continue operations.

### Under the Regional Stay Home Order, retail operations are limited to 20% capacity (or 35% for standalone grocery stores). How is this calculated?                       +

## Stay Home Order

**When does the Stay Home Order go into effect and how long**

**Exhibit 8**

1

1             IN THE UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF CALIFORNIA
2           BEFORE THE HONORABLE JOHN A. MENDEZ

3   **BEST SUPPLEMENT GUIDE,**
   **LLC., ET AL.**
4

              Plaintiff,
5   vs.                  Sacramento, California
                     No. 2:20-CV-00965-JAM-CKD
6                      October 27, 2020
   **GAVIN NEWSOM, ET AL.**       1:56 p.m.
7

             Defendant.
8   _____/

9                  --oOo--

10       REPORTER'S TRANSCRIPT RE: MOTION TO DISMISS

11     **(Hearing conducted via Zoom videoconference)**

12               --oOo--

13   **APPEARANCES:**

14   For the **Plaintiffs:**      Chavez-Ochoa Law Offices, Inc.
                      **Brian Ricardo Chavez-Ochoa**
15                      4 Jean Street, Suite 4
                     Valley Springs, CA 95252
16

   For the **Defendants:**      MEYERS, NAVE, RIBACK, SILVER & WILSON
17   City of Lodi,            **Deborah J. Fox**
   County of San Joaquin     555 Capitol Mall, Suite 1200
18                      Sacramento, California 95814

19   For the **Defendants:**      Office of the Attorney General
   State Defendants        **John William Killeen**
20                      Deputy Attorney General
                     1300 I Street, Suite 125
21                      Sacramento, CA 95814

22   Official Reporter:       Tiphanne G. Crowe
                     CSR No. 10958
23                      501 I Street
                     Sacramento, CA 95814
24                      Tcrowe.csr@gmail.com

25   *Proceedings recorded by mechanical stenography. Transcript*
   *produced by computer-aided transcription.*

2

1    SACRAMENTO, CALIFORNIA, WEDNESDAY, OCTOBER 27, 2020, 1:56 p.m.

2                              --oOo--

3         Calling case 20-CV-00965-JAM-CKD; Best Supplement

4    Guide, LLC, et al. v. Newsom, et al.

5         THE COURT:  Starting with Plaintiffs' counsel, if you

6    would state your appearances for the record, please.

7         MR. CHAVEZ-OCHOA:  Good afternoon, Your Honor.  Brian

8    Chavez-Ochoa on behalf of the Plaintiff, Sean Covell, and

9    Fitness Systems.

10        THE COURT:  Good afternoon.

11        Mr. Killeen.

12        MR. KILLEEN:  Good afternoon, Your Honor.  John

13   Killeen for the State Defendants.

14        MS. FOX:  Good afternoon, Your Honor.  Deborah Fox of

15   Meyers, Nave for the City of Lodi, and the County of San

16   Joaquin, Defendants.

17        THE COURT:  All right.  This is on this afternoon on

18   the Defendants all the Defendants' motions to dismiss the

19   Plaintiffs' Third Amended Complaint.

20        Court's reviewed the briefing in its entirety as well

21   as the Court's prior order that was issued in this case back in

22   May of 2020, May 22nd, 2020, with respect to the Plaintiffs'

23   motion for a temporary restraining order and/or preliminary

24   injunction.

25        So Mr. Chavez-Ochoa, that's where I want to begin.

3

1    I'm sure it's no surprise to you, and it's really cutting

2    through everything, the point raised in the reply briefs.

3         And that is I have reread my order, although it

4    involved not a motion to dismiss, but a motion for a

5    restraining order, or a preliminary injunction.

6         It clearly reached a conclusion that there was no

7    likelihood of success on the merits the claims that had been

8    raised at that point in this case.

9         Since that order, you filed amended complaints to the

10   point now where we are up to the Third Amended Complaint, yet

11   you haven't focused the case at all on what might be your

12   clients' most meritorious claims, and instead, continue to

13   maintain what I would call a "kitchen sink" approach:  Let's

14   keep the nine claims in there and throw everything at the judge

15   and see if something sticks.

16        And if it didn't stick the first time, I'm not sure

17   it's going to stick this time around, because when I saw this

18   case again and read everything again, the first question that

19   pops up is obviously what's changed since May of 2020 to make

20   this situation worse for these defendants -- or Plaintiffs, I'm

21   sorry, such that their claims might have some merit at this

22   point?

23        What's changed at all?  If anything, your clients now

24   are allowed to have activities indoors, albeit severely

25   limited, but at least they're back indoors.  A number of

4

1    restrictions have been lifted, and the Court's underlying legal

2    rationale is still appropriate.

3           And I know that your principle argument really focuses

4    on *Jacobson*, and in effect, that *Jacobson* shouldn't apply to a

5    motion to dismiss.  But I think the reply briefs respond to

6    that and undermined that argument exactly in the manner that

7    that the Court views it, and that is, that's the legal

8    standard.  It's not a procedural issue.

9           The Court has to determine at this point, even at a

10   motion to dismiss point, whether there is any legal basis for

11   these claims.

12          Obviously, we don't have a whole lot of cases prior to

13   all of these lawsuits being brought all over the country

14   challenging the orders of the Government shutting down

15   businesses and the like.

16          And admittedly, almost every court looked to *Jacobson*

17   as the standard, but that hasn't changed.  *Jacobson* is the

18   legal standard in this area.

19          And if that's the standard, and I know you put it in a

20   footnote, if that's what the Court is, in effect, doing, then

21   the Court needs to make that clear.

22          I couldn't be clearer.  I think I made it clear in my

23   May order, and I'm making it clear here today.  That's what I'm

24   looking to as the standard that's to be applied in these --

25   these very unique and unusual cases.

5

1        And applying *Jacobson*, I just don't see any way that

2    that there's been any change in circumstances since May that

3    would allow any of these claims to go forward, and I'll go

4    through each claim so that there's a record, and you understand

5    my rationale.

6        But let me tell you just generally, when I look at

7    your clients' lawsuit, what strikes me in your clients'

8    lawsuit -- and, again, it's pointed out and argued in the

9    briefs by the Defendants -- but what's missing here is any

10   facts to support your clients' claims that these orders, the

11   State orders, and the County orders, that these orders do not

12   bear a real and substantial relation to public health.

13       And there simply is no fact that you have -- you've

14   had obviously months to try to come up with some facts that

15   might support an allegation that would at least give the Court

16   some pause for thinking these orders don't make any sense.

17       There really isn't any relationship or substantial

18   relationship to public health, and I don't think you can -- you

19   can make or raise any facts that would support that type of

20   allegation.  If you could, you would have put it in your

21   complaints.

22       You've had three or four chances, and that's the

23   Achilles heel to your lawsuit, if you want to break everything

24   down, and, you know, wonder what's this judge thinking?

25       There's no -- no scientifically-backed opinion from a

6

1    public health expert.  There's no one from the CDC.  There's no

2    public health official who stated that it's safe to reopen gyms

3    the way your clients want to reopen them.  That -- that these

4    orders don't make any sense.

5            Obviously if you had that, you'd have a much better

6    chance of moving forward and challenging these orders, but

7    that's what strikes me.  That's the glaring omission from this

8    lawsuit.  I've got defendants who have issued orders based on

9    science.  Based on how dangerous this virus is.

10           This is a virus that kills people, and the only way

11   that we've been able to get some type of handle on the virus,

12   from a public health perspective, is to issue orders like the

13   Governor and the county public health officials have ordered.

14           I have yet to see, in any of these cases, some public

15   health official, some scientist come forward and say this makes

16   no sense.  It makes no sense at all.  And I think if it was out

17   there, I would have seen it in your complaint.

18           There's no doubt.  It's, in effect -- as the

19   Defendants' argued -- it's undisputed that the State and County

20   orders do, in fact, bear a real and substantial relation to

21   public health, and then the second part of the *Jacobson* test is

22   whether these orders are, beyond all question, a plain and

23   palpable invasion of Plaintiffs' fundamental rights.

24           In my first order, I have found that there really were

25   no fundamental rights that were being impinged upon here.

7

1    You've added allegations to try to convince me that there are

2    fundamental rights that are being impinged.

3             I didn't find the allegations, the additional

4    allegations, to change my view of that, and then the other part

5    that, beyond all question, this is a plain and palpable

6    invasion.  Again, there's no scientific basis.  No facts to

7    support that type of allegation.

8             I know I threw a lot at you, but that basically was my

9    impression from the reply briefs, and I want to give you an

10   opportunity to respond to the reply briefs.

11            But I just don't see any basis, legal basis, for

12   allowing this lawsuit to go forward in the district court.

13   Okay.  Go ahead.

14            MR. CHAVEZ-OCHOA:  Thank you, Your Honor.  I

15   understand the Court's position.  I understood it from the very

16   beginning.  I think at the time that we filed this complaint we

17   were in the very early stages of what we've been experiencing,

18   both locally, and through the state and the courts countrywide.

19            Since that time, and as we've learned more and more

20   about COVID, I think some of the -- I think it has come out,

21   the world health organization, and has begged the countries not

22   to shut down businesses, so there has been a change of

23   thinking.

24            For CDC, I mean, I would be the first to admit CDC

25   says one thing this week, and then something the next, and then

TIPHANNE G. CROWE
OFFICIAL COURT REPORTER, USDC - (916) 743-0122

8

1    recuse what they said in the prior weeks.

2           But there's been a change in the CDC's guidelines as

3    well, and what we have maintained all along is that you can

4    open a gym, and still maintain CDC guidelines for the health

5    and safety of their clients.

6           The fact that we're this far down the road now, I

7    think gives us a little bit more insight as to what's

8    happening.

9           I think if the Court is going to apply *Jacobson*, and

10   there's no doubt in my mind that it is, my only response to

11   that would be is that even in *Jacobson*, the issue there was

12   mandated vaccines, and there's really three options.

13          You could get -- you could get the vaccine.  You could

14   pay the fine, or you could leave the commonwealth.

15          So there was some options there, which aren't

16   presented here.  Here, my client has had to abide by the

17   mandates of both the state and the local and county health

18   offices.

19          But even in *Jacobson*, the Court said that there might

20   be those circumstances in which the Court would have to

21   intervene, and I think -- and the reason we brought this suit,

22   was we believed that this could be one of those circumstances

23   where we believe the State, the County, and the City Defendants

24   acted perhaps initially in the best interest of the citizens of

25   the state.

9

1          But as it -- as COVID went on, and as we saw the death

2   rates plummet to below -- to less than one percent, and we saw

3   now the recovery of those who have COVID, including our

4   President.  I mean, he was diagnosed with it, what was it, four

5   days later, or five days later, he was cleared to go back to

6   work.

7          THE COURT:  You're really not going to go there and

8   rely on that; are you?

9          MR. CHAVEZ-OCHOA:  Oh, no, no, no.  Not at all, sir.

10  I just --

11          THE COURT:  I don't think if any of us got COVID, we'd

12  get the type of medical treatment that the President of the

13  United States got, so...

14          MR. CHAVEZ-OCHOA:  I concur.  I concur.  But what I'm

15  saying is this:  I think we're seeing in just a -- take me for

16  example, an average citizen, and I'm 64 years of age, and my

17  doctors are pretty sure I had, you know, back in the very early

18  beginnings of COVID, and I was at risk.  I had five heart

19  attacks a year ago today, and had open-heart surgery, and yet I

20  recovered.

21          So I'm not saying, necessarily, that it's -- it's not

22  something that we have to be concerned with, but I think it's

23  something we have to look to, as far as where we are present

24  day, as to where we were when we filed the first -- the first

25  complaint.

10

1        The reason we ended up with the -- the Third, was

2   because this was fluid, and the facts were changing almost on a

3   daily, if not weekly, basis.  So that's where we are at today.

4        I understand that the Court -- the Court's position,

5   and I'm not -- I'm not going to tell the Court anything that we

6   haven't already told you.

7        I think we put it in our opposition.  I think we put

8   it in our complaint, and while I disagree that -- let me say

9   this, I don't think *Jacobson* was ever intended to be a wall or

10  an immunity bar from bringing any actions against government

11  actors under extraordinary circumstances.  I certainly

12  understand the Court's reliance on it.

13       THE COURT:  Okay.

14       Mr. Killeen, anything you want to add?

15       MR. KILLEEN:  Your Honor, the Court hit the nail on

16  the head.  The only thing that has changed here is that

17  conditions have gotten better for the Plaintiffs since May.  I

18  mean, the Court is well aware having handled all of these cases

19  in April and May, gyms were closed, churches were closed,

20  schools were closed.  Everything was closed.

21       And now, for gyms, they are allowed to have outdoor

22  operations with modifications, but with no substantive

23  restrictions.  In San Joaquin County, which is in a Tier 2

24  county, they are allowed to operate indoors with 10 percent

25  capacity.

11

1       The idea -- the idea behind the current regime is

2   that -- that capacity limits increases as the County moves

3   through the tier system.  First it's 10 percent, and then it's

4   20 percent, then it's 50 percent, and then, you know, God

5   willing, all of this goes away, and it becomes 100 percent.

6       But I think the State's response has been

7   well-tailored to respond to the advances we have made since

8   April or May.

9       We have made strides in understanding the difference

10  between indoor and outdoor transmission, and the State's

11  regulations responded to that accordingly, and they certainly

12  have not come anywhere close to being a constitutional

13  violation under *Jacobson*.

14      THE COURT:  I would note it's interesting, and

15  obviously the Court can take judicial notice of certain facts,

16  and I have, but it was only really in a footnote that -- in the

17  State's reply brief -- that the State pointed out that:

18  Subsequent to the filing of the motion to dismiss, the State

19  modified its guidance and put into place the blueprint for a

20  safer economy.  Last accessed on October 19th, 2020.

21      Currently, whether a fitness center may offer indoor

22  classes and services depends on a county's tier status.  San

23  Joaquin County is currently a Tier 2 red substantial, and under

24  state guidance, fitness centers may open for indoor operations

25  at 10 percent capacity.

12

1          So it is, in effect, better than when the lawsuit was

2     first brought.

3          Ms. Fox, anything you want to add?

4          MS. FOX:  Your Honor, I'll be brief, on behalf of the

5     City and the County.  I have three main points that I wanted to

6     make.  I think the Court has covered them, at least two of

7     them, in your comments.  One, there's simply no federally

8     protected right here.

9          Two, the rubric of *Jacobson* applies, and that is a

10    differential rubric, and in this case there is no difference,

11    and change of the law or any circumstances that would warrant,

12    as a matter of law, this complaint moving forward.

13         And finally, Your Honor, that there has not been any

14    allegations of official policy or practice as against the City

15    of Lodi and the police Chief.

16         The mere appearance of two officers at the fitness

17    center advising them and educating them about the public health

18    order, does not rise to a level of official action under

19    *Monell*.  There was no citation.  There was no arrest.  There

20    was no City Council action.  There was no action by an official

21    decision-maker.

22         I would just like to add for the record a couple of

23    items since the Court's well-reasoned decision of May 22nd.  On

24    May 29th, Your Honor, we had the decision from the United

25    States Supreme Court in the *South Bay United Pentecostal* case

13

1   versus Newsom.  That was on the emergency application.  There,

2   again, the Court used and validated the rubric of *Jacobson*.

3           I think that the discussion by Judge Roberts, Chief

4   Justice, is worth offering this afternoon.

5           Justice Roberts writes:  Our Constitution principally

6   entrusts the safety and the health of the people to the

7   pubically accountable officials of the state to guard and

8   protect.

9           While those officials undertake to act in areas

10  fraught with medical and scientific uncertainties, the latitude

11  must be especially broad.  The federal judiciary, Chief Justice

12  Roberts goes on, should not second-guess them.  This is a

13  health crisis of a once in a century.

14          I know that it is certainly that no one underestimates

15  or wants to diminish the financial and emotional toll that we

16  all suffer here.

17          But the fact is that under the rubrics at play, they

18  have not met the *Jacobson* test, and the orders are presumed

19  constitutional.

20          They have no fundamental right.  There's no

21  constitutional right to work out indoors.  There's no

22  constitutional right to associate and speak to your trainer, or

23  speak to your gym buddies.  That does not rise to a protected

24  First Amendment right.  There's simply no support for that case

25  law.

14

1        Your Honor, I had a lot more to say, but I think that

2    you've spent so much time and read the papers, that we'll

3    submit on the papers, unless the Court has some additional

4    questions that you would like me to answer this afternoon.

5        THE COURT: Mr. Chavez-Ochoa, I did want to raise that

6    with you just to give you an opportunity for purposes of making

7    a record, that I did not see, in effect, any response to that

8    argument with respect to the City.

9        I thought it was a meritorious argument, but I don't

10    know if you want to respond just for purposes of the record, or

11    whether you are conceding that there really is no basis to keep

12    the City in this lawsuit?

13        MR. CHAVEZ-OCHOA: Well, your Honor, thank you for

14    asking. As far as the City, it was more than just the two

15    officers. You know, it was at the direction of the City itself

16    to send them out, and whether or not they were there for

17    purposes of education, or otherwise, I mean, we raised it in

18    our allegation, that's something that would have been ferreted

19    out later on in discovery.

20        So I can't answer beyond what I've put. The only

21    other thing that I would answer, Your Honor, or add to what

22    I've already said, and what everybody else has said, because

23    it's been very well-briefed, is it would appear to be the way

24    that these orders have been enforced.

25        I mean, we're all aware of the horrific, and horrible

15

1    fates we've seen taking place in the streets and in our City,

2    not only here in this state, but across the country.

3         And it would appear that there is no enforcement of

4    some of the demonstrations, and probably well-placed

5    demonstrations that should have been allowed, and have been

6    allowed to take place.  And not only the demonstrations, but

7    some of the other acts that are absolutely horrific.

8         But, nonetheless, you know, I think that's one of the

9    things that goes along with what we've said in our opposition.

10         But, Your Honor, as I said moments ago, I'm not going

11   to challenge you.  I don't agree with you, Your Honor, that

12   *Jacobson* is blanket immunity, but I understand that was your

13   position when you issued the denial of the initial request for

14   temporary restraining order and preliminary injunction.  So

15   I -- I --

16         THE COURT:  The question more on the City was simply,

17   normally when there isn't a response to an argument in a

18   motion, I take that as a concession that the argument has

19   merit, and I didn't see, again, any response -- specific

20   response -- in your opposition brief to the arguments raised by

21   Ms. Fox on behalf of the City.

22         This isn't a *Monell* claim, and there's really no basis

23   for keeping the City in this lawsuit.  Should I take your

24   failure to respond as a concession?

25         MR. CHAVEZ-OCHOA:  No, Your Honor.  It was at least

16

1    our intention to include all of the Defendants, and not leave

2    out the City, and if we did, it was by omission on our part.

3         THE COURT:  Okay.

4         MS. FOX:  May I respond, Your Honor?

5         THE COURT:  I don't need any further argument.  I'm

6    not going to issue a written opinion.  What I will do at this

7    point is I will go through in as much detail as I think is

8    necessary so there's, in effect, an order on the record in the

9    event this is appealed.

10        The order, in effect, will be the transcript from this

11   hearing.  To give you, again, what I've already explained very

12   generally, this is my reason for finding that these motions are

13   meritorious and should be granted.

14        But let me go through these as quickly as I can,

15   claim-by-claim, so everything is covered.

16        As the Court indicated, both the County and the City

17   Defendants have moved to dismiss this entire action on the

18   grounds that the Plaintiffs have failed to state a claim upon

19   which relief can be granted.

20        The Defendants' primary argument is that the

21   Plaintiffs still have not identified any protected

22   constitutional right to indoor gym operations.  Defendants

23   further contend that even if Plaintiffs have alleged a

24   protected constitutional right, that they failed to allege that

25   right has been violated under either of the deferential

17

1  *Jacobson* framework, or the traditional constitutional standards

2  that apply during non-emergency times.

3       Plaintiffs respond that the Court should not apply

4  *Jacobson* when deciding this motion to dismiss, and instead that

5  the Court should apply traditional constitutional standards.

6       The Court finds that the Plaintiff misunderstands what

7  the application of *Jacobson* entails, and equates the

8  application of *Jacobson* with the application of a higher

9  pleading standard.

10       Plaintiffs' misunderstanding of *Jacobson* is

11  encapsulated from the following line in their opposition brief,

12  quote, "This Court should reject the State and local

13  Defendants' invitation to invent and to apply their proposed

14  heightened *Jacobson* pleading standard."

15       *But Jacobson* is not about pleading standards.

16  *Jacobson* provides the substantive elements needed to state a

17  constitutional claim during a public health emergency.

18       The elements under *Jacobson* are, one, whether the

19  Government action has a real or substantial relation to the

20  crisis, and, two, whether the Government action is not beyond

21  all question a plain, palpable invasion of rights secured by

22  the fundamental law.

23       As indicated from my May decision, with respect to the

24  preliminary injunction, I have already decided the issue with

25  respect to Plaintiffs' arguments that *Jacobson* should not

18

1    apply, and we've discussed that already.

2         And I did apply *Jacobson* in deciding the TRO

3    application, and I applied *Jacobson* when deciding motions on

4    pleadings and other legal challenges to State and County health

5    orders, and other orders that I've issued including *Givens v.*

6    *Newsom* from May 8th, 2020, and *Cross Culture Christian Center*

7    *v. Newsom* issued on May 5th, 2020.

8         And until or unless the Ninth Circuit or the Supreme

9    Court possibly revisits *Jacobson* or provides a different

10   standard for evaluating State action that's taken to protect

11   public health, the Court does find that *Jacobson* remains the

12   proper standard to be applied throughout this litigation.

13        Under *Jacobson* the Court must uphold the gym closures

14   required by the State and County stay-at-home orders, unless,

15   again, there's no real or substantial relation to public

16   health, or the measures, beyond all question, a plain, palpable

17   invasion of rights secured by the fundamental law.

18        Taking up that first factor, the Court does find that

19   this complaint, the Third Amended Complaint, does fail to

20   allege any facts that could support the contention that the

21   public health orders lack a real or substantial relation to the

22   pandemic.  And as I've indicated, the Court is skeptical that

23   the Plaintiffs could do so.

24        As I've explained in my prior order, denying the TRO

25   request, COVID-19 is extremely infectious.  Easily spread

19

1    through droplets generated when an infected person coughs or

2    sneezes or through droplets of saliva or discharge from the

3    nose.

4           This undisputed information about COVID-19 and its

5    transmission logically explains why the State and County

6    officials have found that temporary gym closures were and

7    continue to be a critical step in slowing the virus' spread.

8           Workout facilities often contain high-density groups,

9    congregating and exercising in closed areas, at the same time

10   breathing heavily and sharing gym equipment.

11         And in the *League of Independent Fitness Facilities*

12  *and Trainers* case, that court addressed a similar legal

13  challenge to pandemic-related gym closures and also noted that

14  heavy breathing and sweating in an enclosed space containing

15  many shared surfaces creates conditions likely to spread the

16  virus, and fairly supports the Governor's treatment of indoor

17  fitness facilities.

18         While the Plaintiffs have amended their complaint

19  three times since the denial of the request for a TRO, there

20  has not been any factual allegations added that go to how the

21  Governor's orders, or the County orders lack a real or

22  substantial relation to the pandemic.

23         There are new factual sections in the Third Amended

24  Complaint that have to do with the social value of gyms.  The

25  George Floyd protests.  June and July changes to State and

20

1    County public health orders.

2         But there have not been any facts added that go to the

3    issue of whether the orders lack a real or substantial relation

4    to the pandemic.

5         Because the Third Amended Complaint fails to allege

6    sufficient facts to support the claim that the orders lack a

7    real or substantial relation to the pandemic, it does fail, as

8    a matter of law, on the first prong on *Jacobson*.

9         The Third Amended Complaint also fails as a matter of

10   the law to show that the challenged orders are, quote, beyond

11   all question, a plain and palpable invasion of rights secured

12   by fundamental law.

13        In my prior order I explained that this standard

14   plainly puts a thumb on the scale in favor of upholding state

15   and local officials emergency public health responses.

16        But as I'll go on to explain, this Court does not even

17   need to be a thumb on the scale, because Plaintiffs have failed

18   to show any rights secured by the fundamental law is at issue

19   in this case, and let alone that such a right has been

20   violated.

21        And for this reason, the Court finds that the Third

22   Amended Complaint fails even when viewed under traditional

23   constitutional standards.

24        Starting with Count 1, the First Amendment claim, the

25   Plaintiffs argue that the standing county gym closures

21

1   unlawfully infringe upon their freedom of speech assembly and

2   expressive association.

3          The First Amendment does protect individuals from undo

4   interference with their freedom of speech assembly and

5   expressive association.

6          The First Amendment's free speech clause only affords

7   protection to symbolic or expressive conduct and actual speech.

8          Again, going to my prior order from May, I did warn

9   that:  Plaintiffs' motion fails to explain how the State and

10  County gym closures prohibit protected speech.

11         The State and County gym closures plainly restrict

12  non-expressive conduct operating gyms, and this Court lacks any

13  authority for the proposition that operating a gym implicates

14  the First Amendment's free speech protections.

15         That view remains, to this day, and as argued by the

16  Defendants, this case that the gyms claim -- at least this

17  claim -- involves non-expressive conduct with an incidental

18  effect on speech.  It doesn't involve speech or expressive

19  conduct as you would expect in a claim of this type.

20         The Third Amended Complaint fails to provide authority

21  supporting the Plaintiffs' position that operating a gym

22  implicates First Amendment freedoms of assembly and of

23  association protections.

24         The freedom of association and freedom of assembly

25  protections are largely viewed as one, and parties may only

22

1    bring an expressive association claim under the First Amendment

2    if they demonstrate they are asserting their right to associate

3    for the purpose of engaging in those activities protected by

4    the First Amendment, speech, assembly, petition for the redress

5    of grievances, and the exercise of religion.

6              While Plaintiffs' attempt to characterize the

7    interactions between gym staff and customers as expressive

8    association, the Plaintiffs still have offered no legal

9    authority to support the idea that this type of non-expressive

10   commercial interaction is, in fact, protected.

11             In short, the Plaintiffs have not identified any

12   excessive conduct or speech that is protected by the First

13   Amendment.  The addition of new factual sections in the Third

14   Amended complaint, apparently intended to show the preference

15   of one topical category of speech over another constituting

16   content-based restrictions is still of no avail.

17             The new amendments to the complaint do nothing to

18   further Plaintiffs' First Amendment arguments, because the

19   Plaintiffs still have not shown that the First Amendment

20   protections are triggered in the first instance for the

21   non-expressive conduct at issue, and, therefore, Count 1, the

22   first claim, fails as a matter of law to state a claim for

23   relief under the First Amendment.

24             And while the inquiry could end there, the Court does

25   note that even if Plaintiffs could show that the First

23

1    Amendment free-speech protections were somehow triggered, the

2    orders would still be constitutional, because they are content

3    neutral, narrowly tailored to serve a significant governmental

4    interest, and they leave open ample alternative means of

5    communication.

6          Indeed, the only thing the orders have even prohibited

7    Plaintiffs from, in terms of speech, are conversations inside

8    the gym due to the danger of the spread of the COVID-19 virus.

9    Plaintiffs have always been permitted to communication and

10   associate with their clients through virtual gatherings, and

11   through things such as Zoom.

12         And since July, Plaintiffs have been free to conduct

13   outdoor gatherings with their clients, although the Court

14   understands that this gym in particular has pointed out that

15   they aren't allowed to engage in outdoor activities.

16         Likewise, even if Plaintiffs could show that the First

17   Amendment free association assembly protections were triggered

18   here, the orders would still be constitutional, because they

19   serve a compelling state interest unrelated to the suppression

20   of ideas, namely responding to a public health emergency that

21   cannot be achieved through means less restrictive of

22   associational freedom.

23         Turning to the takings claims in Count 2 and Count 9,

24   under both Federal and State law.   In those claims, the

25   Plaintiffs allege that these orders constitute a regulatory

24

1     taking by the County and City Defendants in violation of the

2     Fifth Amendment.

3           The Defendants respond, first, that a takings claim

4     cannot operate as a substitute for a challenge to the

5     substantive validity of a law, citing to *Lingle v. Chevron*

6     *U.S.A.*

7           The Defendants argue the Plaintiffs' takings claim

8     must fail here, because they really are actually challenges to

9     the substantive validity of the public health orders.

10          The Plaintiffs attempt to distinguish *Lingle* by simply

11    arguing that the procedural posture of *Lingle* was a summary

12    judgment motion, not a motion to dismiss, and, therefore,

13    according to the Plaintiffs, all they need to do at this stage

14    is allege facts and establish a taking without compensation.

15          The Court does not find merit in that argument, but

16    even if the Court were to accept the procedural argument,

17    Plaintiff still -- the Court finds -- have failed to

18    establish a regulatory taking.

19          The case of *Tahoe-Sierra Pres. Council v. Tahoe*

20    *Regional Planning Agency* is instructive.  In that case the

21    Supreme Court held that even a complete but temporary

22    restriction on property use, like the 32-month moratorium on

23    the development at Lake Tahoe, which was at issue, did not in

24    and of itself, constitute a regulatory taking.

25          Indeed, if the Supreme Court did not find a 32-month

25

1   moratorium to constitute a regulatory taking, Plaintiffs'

2   allegations of a few months of gym closures, and now capacity

3   restrictions on re-opening, are clearly insufficient to

4   establish a regulatory taking, and, therefore, Plaintiffs'

5   takings claim under the Fifth Amendment fails as a matter of

6   law.

7           As with the federal claim, Plaintiffs' takings claim

8   under the California Constitution in Count 9 also fails.

9   Plaintiffs argue that California Takings Clause differs greatly

10   from the Federal Takings Clause, but the California Supreme

11   Court has held that the California Constitution Takings Clause

12   should be construed congruently with the Federal Takings

13   Clause.  That's the *San Remo Hotel v. City and County of San*

14   *Francisco* case.

15           Further under California law, the challenged orders

16   would survive as lawful and temporary economic restrictions

17   supported by inherent police power, *First English Evangelical*

18   *Lutheran Church v. County of Los Angeles,* a 1989 Court of

19   Appeals case, where the Court held that a temporary prohibition

20   did not amount to a compensable taking.

21           This analysis applies, and Plaintiffs' state law

22   takings claim also fails as a matter of law.

23           Plaintiff raises in Count 3 an allegation and a claim

24   that the order violated their right to travel under the

25   Fourteenth Amendment Privileges or Immunities Clause.  This

26

1    right embraces at least three different components.

2           One, the right of a citizen of one state to enter and

3    leave another state.  Two, the right to be treated as a

4    welcomed visitor when temporarily present in another state.

5           And, Three, the right for travelers to elect to become

6    residents to be treated like other residents of that state.

7    Neither the Supreme Court, nor the Ninth Circuit has recognized

8    a constitutional right to intrastate travel.

9           Plaintiffs acknowledge that no such right has been

10   recognized by the Ninth Circuit or the Supreme Court, but

11   Plaintiffs ask, or argue, that they have well-pled facts

12   alleging injury to the right to travel for which they seek

13   vindication here.

14          But because the constitutional right to intrastate

15   travel does not exist, it is not relevant what facts Plaintiffs

16   have pled.

17          This Court declines Plaintiffs' invitation.  This is

18   not the court to create a constitutional right, that neither

19   the Ninth Circuit, nor the Supreme Court have found exists.

20          The Court declines that invitation, therefore, and

21   dismisses the Count 3 claim that is based upon that theory and

22   those allegations.

23          Interesting claim.  Creative.  But I'll let the Ninth

24   Circuit or Supreme Court tell me if it really exists.  That's

25   not my place.

27

1        In Count 4 there are three separate violations of the

2   Fourteenth Amendment Due Process Clause that are raised.

3        A procedural due process claim, a substantive due

4   process claim, and a vagueness claim.  I addressed all of those

5   in the May order.  My view of the claims, the due process

6   claims back then, has not changed.  Very simply and quickly,

7   there is no legal requirement that notice be provided before

8   the orders were issued.

9        There's no law that supports that type of procedural

10  due process claim, and, therefore, that claim fails as a matter

11  of law.

12        The substantive due process claim also fails.  In

13  order to state a claim for substantive due process, the

14  Plaintiff has to show that the state action challenge neither

15  shocks the conscience, or arbitrarily deprives the Plaintiff of

16  a fundamental right.

17        One, there are no fundamental rights that have been

18  identified in this case, and, therefore, that claim fails.

19  This also is the case that involves a state action that shocks

20  the conscious.

21        In terms of the vagueness portion of the due process

22  claim, the Plaintiffs argue that the orders are

23  unconstitutionally vague because they fail to provide a person

24  of ordinary intelligence fair notice of what is prohibited, or

25  are so standardless that it authorizes or encourages seriously

28

1    discriminatory enforcement.

2            Understandably, Plaintiffs are frustrated that the

3    orders continue to be changed or modified with little or no

4    advanced notice, and according to the Plaintiffs, embody the

5    whims of the Defendants.

6            Obviously that's a sentiment that many other business

7    owners, many other individuals, share that sentiment, but that

8    doesn't mean that the grievance rises to the level of

9    unconstitutional vagueness, at least not as pled.

10            Plaintiffs needed to plead more than a conclusory

11    allegation that the public health orders are vague.  Again,

12    under *Ashcroft v. Iqbal*, mere conclusory statements do not

13    suffice in complaints.

14            Plaintiffs have failed to explain alleged facts that

15    show how the orders are vague as to what is permitted and what

16    is not, such that a person of ordinary intelligence would not

17    have fair notice of what is prohibited.

18            Indeed, through their allegations in the Third Amended

19    Complaint, Plaintiffs themselves have acknowledged that they

20    actually understand the public health orders and what they do

21    and do not permit.

22            As pled, the vagueness claim also fails as a matter of

23    law.

24            Count 5 is a Fourteenth Amendment Equal Protection

25    Clause claim.  Count 8 is the State counterpart, California

TIPHANNE G. CROWE
OFFICIAL COURT REPORTER, USDC — (916) 743-0122

29

1    Constitutional Equal Protection Clause claim.  The same

2    claim was -- the federal claim was part of the motion for a

3    restraining order.

4            In the prior order this Court explained that the Equal

5    Protection Clause prohibits the Government from drawing

6    arbitrary distinctions between individuals based solely on

7    differences that are irrelevant to a legitimate governmental

8    objective.

9            Equal Protection claims only garner strict scrutiny

10   when a law disadvantages a suspect class, or impinges upon a

11   fundamental right.

12           In the May order, the Court explained that rational

13   basis review applies to the challenged orders, do not impinge

14   upon Plaintiffs' fundamental rights, nor do they discriminate

15   based on any suspect classification.

16           Plaintiffs do raise an argument with respect to the

17   George Floyd protests.  Plaintiff contends that the decisions

18   of the State and County to accommodate, encourage and endorse

19   those demonstrations, protests, et cetera, embody a preference

20   for those messages over the messages of the Plaintiffs, and

21   that a preference for one message embodies a classic violation

22   of the Equal Protection Clause.

23           Plaintiffs then insist that strict scrutiny applies

24   because of this preferential and favorable treatment given to

25   the George Floyd protestors.

30

1        The Court disagrees as explained with respect to the

2   First Amendment claim.  Plaintiffs have failed to allege that

3   the First Amendment protections attach in the first instance,

4   and because none of their other claims survived the Court's

5   analysis, there is no fundamental right upon which the orders

6   have impinged, and, therefore, no fundamental right upon which

7   strict scrutiny could be triggered.

8        The Court's conclusion does remain the same, that

9   rational basis applies, and as explained in the May order, the

10  Governor's orders, and the County Public Health official orders

11  clearly pass muster under a rational basis review.

12       In my TRO order I explained that the decision to

13  include gyms within the general prohibition on large indoor

14  gatherings was rational, given the fact that gyms are

15  particularly high-risk environments for the transmission of

16  COVID-19.

17       The newest restrictions on gyms reopening, including

18  capacity restrictions, likewise, passes rational basis review,

19  because they are rationally related to slowing the spread of

20  COVID-19, because the challenged orders easily survive rational

21  basis review, Plaintiffs' Fourteenth Amendment Equal Protection

22  claim fails.

23       In Count 8, Plaintiffs allege the orders violate the

24  Equal Protection Clause of the California Constitution.

25  Parties do agree that equal protection claims under the

31

1    California Constitution are generally analyzed the same as

2    equal protection claims under the United States Constitution,

3    and, therefore, given the fact that the claim fails under the

4    U.S. Constitution, it fails as well as a matter of law under

5    California Constitution.

6         Count 6 is a Contracts Clause claim.  Court finds the

7    Plaintiffs have not alleged any facts showing that the orders

8    that are being challenged lack a significant and legitimate

9    public purpose.

10        Rather than allege facts, Plaintiffs merely repeat a

11   conclusory statement that, quote, "There is no significant or

12   legitimate public purpose underlying the orders complained of

13   in the opposition brief."

14        And that's from their Third Amended Complaint at

15   paragraph 350.  This conclusory statement does not suffice to

16   state a claim without any contrary showing.

17        This Court concludes the obvious, that the orders

18   being challenged do, in fact, have a significant and legitimate

19   public purpose to curb the spread of COVID-19.

20        Plaintiffs have also not alleged any fact showing that

21   the contractual impairments resulting from the orders are not

22   reasonable and necessary to fulfill a public purpose.

23        Again, Plaintiffs' argument is simply to repeat the

24   same conclusory statement that Fitness Systems has alleged,

25   which is that the orders complained of are neither reasonable

32

1   or necessary to the service of the alleged government interest.

2          As this Court has noted, the orders, while exacting,

3   are temporary, rooted in science, and proportional to the

4   threat that COVID-19 poses.

5          Plaintiffs' conclusory arguments and allegations do

6   not provide the Court with any reason to change its analysis,

7   and the Plaintiffs' claim under the Contracts Clause fails as a

8   matter of law.

9          And then finally the last count, Count 7, alleges a

10  violation of the California Constitution's Liberty Clause.

11  This Court has already determined that neither the County

12  order, generally, nor its gym closures, specifically, amount to

13  virtual imprisonment such that it violates Plaintiffs' right to

14  liberty under the cases the Plaintiffs cite.

15         That was the Court's view back in May.  It's still the

16  Court's view and analysis.  The challenged public health orders

17  simply do not operate as a quarantine on Plaintiffs, let alone

18  amount to a virtual imprisonment.

19         Indeed, Plaintiffs' best supplemental is a corporate

20  entity.  It cannot be either infected or quarantined, and

21  Plaintiff, Sean Covell, is not, and has never been restrained

22  from leaving his home, therefore, this claim plainly fails.

23         In short, Plaintiffs have failed to show that any

24  right secured by the fundamental law is at issue here, let

25  alone that there has been a plain and palpable invasion of such

33

1    a right.

2              No constitutionally protected right attaches to indoor

3    gym activities, and while the Court has expressed its

4    understanding and concern not only for Plaintiffs' economic

5    plight, but the plight of all businesses that have been

6    affected due to this pandemic.

7              The Court has also recognized that these orders play

8    an important role in preventing what is a serious -- a deathly

9    challenge to the public health.

10             And the courts, as I indicated in my order in May, the

11   courts appreciate -- and I want to read this again:

12             This Court finds that the State and County orders, as

13   is, and is currently applied, are a constitutional response to

14   an unprecedented pandemic.

15             Plaintiffs continued compliance with these orders are

16   essential to the well-being of the general public.  The

17   continued performance of this critical civic duty will help

18   prevent the spread of COVID-19 and save lives, and for this,

19   the Plaintiffs, and all gym owners similarly situated, are to

20   be commended.

21             Finally, with respect to the City Defendants, I do

22   agree with Ms. Fox's argument, that in addition to the reasons

23   for dismissal that I just discussed, there's also a separate

24   and independent reason for dismissing the claims against the

25   City Defendants, and that is the Plaintiffs have not alleged a

34

1    single City policy or custom to support that claim against the

2    City Defendants, and in order to establish municipal liability

3    under Section 1983, the Plaintiff must show that the policy or

4    custom led to Plaintiffs' injury.

5         Absent an explicit policy, a Plaintiff may satisfy the

6    requirement by showing there's a custom that deprives the

7    Plaintiff of his or her constitutional rights, but random acts

8    or isolated events are insufficient to establish custom.

9         Plaintiffs only alleged one contact with the City

10   Defendants when the Lodi police officers came out to

11   Plaintiffs' gym to educate them about health orders, and

12   potential consequences of violating the orders by reopening

13   the gym.

14        One isolated incident is insufficient to establish a

15   custom or policy, and for this additional reason, the

16   Plaintiffs' claims against the City Defendants fail as a matter

17   of law.

18        And then finally, with respect to leave to amend, the

19   leave to amend is denied.  The Court does dismiss all of these

20   claims with prejudice.

21        At this point, Plaintiffs have had ample opportunity

22   to try to state claims that would survive dismissal.  This is

23   the Third Amended Complaint, as I have indicated, and any

24   further amendment the Court finds would be futile.

25        For those reasons, the Court grants the County and

35

1   City Defendants' motion to dismiss.  The Court grants the State

2   Defendants' motion to dismiss, and Plaintiffs' request for

3   leave to amend is denied.

4          Okay.  Thank you all.  The transcript, as I said, will

5   serve as the Court's order, and hopefully creates a sufficient

6   record if this goes up on appeal.  Okay.  Thank you.

7          MR. FOX:  Thank you, your Honor.

8          MR. CHAVEZ-OCHOA:  Thank you, your Honor.

9          MR. KILLEEN:  Thank you, your Honor.

10         (The proceedings adjourned at 2:51 p.m.)

11                      --oOo--

12   I certify that the foregoing is a correct transcript from the

13   record of proceedings in the above-entitled matter.

14                      /s/ Tiphanne G. Crowe

15                      TIPHANNE G. CROWE
                        CSR No. 10958

16

17

18

19

20

21

22

23

24

25

# Exhibit 9

## Article 4. Health Officer

**Sec. 2-1.401.  Appointment.**

The County Health Officer appointed by the Board of Supervisors of the County shall serve as the Health Officer for the City concurrently with the City's Code Enforcement Officers who may also discharge all or a portion of the functions and duties of the Health Officer.

(§ 1, Ord. 889-NS, eff. May 28, 1985, as amended by § 12, Ord. 907-NS, eff. February 11, 1986)

**Sec. 2-1.402.  Duties.**

It shall be the duty of the Health Officer to enforce all the laws of the City pertaining to causes of sickness, nuisances, and sources of filth within the City, all orders, quarantine regulations, and rules prescribed by the Board of Health of the State, and all statutes of the State relating to vital statistics. The Health Officer shall generally supervise all matters pertaining to the health and sanitary conditions of the City.

(§ 1, Ord. 889-NS, eff. May 28, 1985)

1  MICHAEL G. WALKER. State Bar No. 150554
   County Counsel, County of Ventura
2  JACLYN SMITH, State Bar No. 274311
   Assistant County Counsel
3  CHRISTINE RENSHAW, State Bar No. 249618
   Assistant County Counsel
4  BRETT B. McMURDO, State Bar No. 293050
   Assistant County Counsel
5  800 South Victoria Avenue, L/C #1830
   Ventura, California 93009
6  Telephone: (805) 654-2773
   Facsimile: (805) 654-2185
7  E-mail: jaclyn.smith@ventura.org

8  Attorneys for Plaintiffs County of Ventura
   and Robert Levin. M.D.. in His Capacity as
9  Health Officer for Ventura County

VENTURA
SUPERIOR COURT
**FILED**

JAN **2 7** 2021

MICHAEL D. PLANET
Executive Officer and Clerk
BY:_____, Deputy

**JEANETTE FIMBRES**

**(EXEMPT FROM FILING
FEES [Gov. Code, § 6103].)**

10

11                SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

12

13  COUNTY OF VENTURA and ROBERT )   No. 56-2021-00549550-CU-MC-VTA
    LEVIN. M.D.. in his capacity as Health )
14  Officer for Ventura County,           )   Reservation No. 2548913
                                          )
15            Plaintiffs,                 )   NOTICE OF AND EX PARTE
                                          )   APPLICATION FOR TEMPORARY
16       vs.                              )   RESTRAINING ORDER AND ORDER TO
                                          )   SHOW CAUSE RE ISSUANCE OF
17  WESTLAKE FITNESS LLC; ART             )   PRELIMINARY INJUNCTION;
    GILFUS; and DOES 1-1000, inclusive,   )   MEMORANDUM OF POINTS
18                                        )   AND AUTHORITIES; DECLARATIONS
            Defendants.                   )   OF ROBERT LEVIN, M.D., SEAN JONES,
19                                        )   ANNE GUEVARRA, and CHRISTINE
                                          )   RENSHAW
20                                        )
                                          )   [Request for Judicial Notice filed
21                                        )   concurrently herewith]
                                          )
22                                        )   Date:       January 28, 2021
                                          )   Time:       8:30 a.m.
23                                        )   Courtroom:  40
                                          )   Judge:      Hon. Mark Borrell
24                                        )
                                          )   Verified Complaint Filed: January 19, 2021
25  _____ )

26

27

28

**NOTICE OF AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

<u>**Page**</u>

NOTICE OF HEARING........................................................ v

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 1

I     INTRODUCTION....................................................... 1

II    BACKGROUND AND FACTS ........................................ 2

III   DEFENDANTS' FAILURE AND REFUSAL TO COMPLY WITH THE
HEALTH ORDERS.................................................... 5

IV   NOTICE OF APPLICATION ......................................... 6

V    ARGUMENT........................................................... 6

    A. Legal Standard for Injunctive Relief ............................... 6

    B. Plaintiffs are Likely to Prevail on the Merits........................ 7

       1. Defendants' Operation of Indoor Gym During the Peak of the
Pandemic in Ventura County Violates the Health Orders, the Closure Orders and
California Law ........................................................ 7

       2. The Health Orders Impose Constitutional Measures to Address a Public
Health Emergency..................................................... 9

    C. Unless Defendants Are Enjoined from Violating the Health Orders,
the General Public, Including All Residents of Ventura County, Will Suffer Irreparable
Harm ................................................................ 12

    D. The Balance of the Equities Weighs Overwhelmingly in Plaintiffs'
Favor ................................................................ 12

VI   CONCLUSION ...................................................... 14

**TABLE OF AUTHORITIES**

Page

**FEDERAL CASES**

*Best Supplement Guide. LLC v. Newsom* (May 22. 2020)
    2020 WL 2615022 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 11

*Jacobsen v. Massachusetts* (1905)
    197 U.S. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Kansas v. Hendricks* (1997)
    521 U.S. 346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*League of Independent Fitness Facilities & Trainers*
    814 Fed.Appx. 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Marshall v. United States* (1974)
    414 U.S. 417 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Roman Catholic Diocese of Brooklyn v. Cuomo* (Nov. 25, 2020)
    2020 WL 6948354 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*South Bay United Pentecostal Church v. Newsom* (2020)
    140 S.Ct. 1613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

*Xponential Fitness v. Arizona* (July 14, 2020)
    2020 WL 3971908 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATE CASES**

*Common Cause v. Board of Supervisors* (1989)
    49 Cal.3d 432 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dodge, Warren & Peters Ins. Servs., Inc. v. Riley* (2003)
    105 Cal.App.4th 1414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*IT Corp v. County of Imperial* (1983)
    35 Cal.3d. 63 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Levin v. Adalberto* (2007)
    156 Cal.App.4th 288 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*People ex rel. Gow v. Mitchell Brothers' Santa Ana Theater* (1981)
    118 Cal.App.3d 863 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Right Site Coalition v. Los Angeles Unified School Dist.* (2008)
    160 Cal.App.4th 336 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*White v. Davis* (2003)
    30 Cal.4th 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Wind v. Herbert* (1960)
    186 Cal.App.2d 276 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**STATE STATUTES**

**Page**

Code of Civil Procedure

§ 527 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v, 7
§ 527, subd. (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

California Code of Regulations

tit. 7, § 2500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
tit. 7, § 2500, subd. (j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
tit. 7, § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
tit. 7, § 2501, subd (a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
tit. 7, § 2505. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Government Code

§ 8634 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9

Health & Safety Code

§ 101040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9
§ 101040, subd. (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9
§ 120220. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
§ 120295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
§ 131082 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**RULES OF COURT**

California Rules of Court

3.1150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v
3.1200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

iv

**NOTICE OF AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

1                             **NOTICE OF HEARING**

2 **TO DEFENDANTS:**

3        Pursuant to Code of Civil Procedure section 527 and California Rules of Court,

4 rules 3.1150 and 3.1200 et seq., plaintiffs County of Ventura and Robert Levin, M.D., in

5 his capacity as Health Officer for Ventura County ("County Health Officer"), hereby

6 apply for a temporary restraining order and order to show cause re issuance of a

7 preliminary injunction enjoining and prohibiting defendants Westlake Fitness LLC which

8 operates a gym and/or fitness center under the name "Anytime Fitness" (hereafter

9 "Anytime Fitness - Westlake") which is located at 101 North Westlake Boulevard, #100,

10 Westlake Village, Ventura County, California (Westlake Village is part of the City of

11 Thousand Oaks); owner Art Gilfus and Does 1-1,000, and each of them, and their agents,

12 employees, representatives, members, and volunteers, and all persons acting under, in

13 concert with or for them, from operating indoor gyms and/or fitness centers in violation of

14 state public health orders.

15        This application is made on the grounds that the California Department of Public

16 Health, State Public Health Officer's ("State Public Health Officer") orders as they apply

17 to indoor gyms and fitness centers are necessary to protect the health of the general

18 public, including all Ventura County residents, and immediate and irreparable injury will

19 result unless defendants are immediately restraining from disobeying such orders pending

20 hearing on an order to show cause re issuance of a preliminary injunction.

21        The application will be based on this application, the attached Memorandum of

22 Points and Authorities, the accompanying Request for Judicial Notice, Declarations of

23 Robert Levin, M.D., Sean Jones, Anne Guevarra, Christine Renshaw, the Verified

24 Complaint on file herein, and such other and further evidence as may be presented to the

25 court at the time of hearing.

26        On January 25, 2021, at approximately 4:25 p.m, counsel for plaintiffs provided

27 notice to Art Gilfus by telephone.  Counsel for plaintiffs left a voicemail for Gilfus

28 informing him that plaintiffs were filing this notice of plaintiffs' ex parte application for a

1  temporary restraining order, notifying him of the date, time and place of the hearing on
2  the application and explaining the basis for the application and relief sought.  Counsel for
3  plaintiffs explained that the hearing was with respect to Westlake Fitness LLC and Art
4  Gilfus.  (See Declaration of Christine Renshaw ("Renshaw Decl."), ¶ 2.)

5          On January 25, 2021, at approximately 4:29 p.m, counsel for plaintiffs provided
6  notice to Matt Stoller, the agent for service of process for defendants by telephone.
7  Counsel for plaintiffs spoke with Mr. Stoller and informed him that plaintiffs were filing
8  this notice of plaintiffs' ex parte application for a temporary restraining order, notifying
9  him of the date, time and place of the hearing on the application and explaining the basis
10  for the application and relief sought.  Counsel for plaintiffs explained that the hearing was
11  with respect to Westlake Fitness LLC and Art Gilfus.  (See Declaration of Christine
12  Renshaw ("Renshaw Decl."), ¶ 3.)

13          On January 25, 2021, counsel for plaintiffs additionally e-mailed Mr. Stoller again
14  listing the date, time and place of the hearing on the application and explaining the basis
15  for the application and relief sought. Mr. Stoller responded to the email confirming
16  receipt.  (Renshaw Decl., ¶ 4.)

17                                                  MICHAEL G. WALKER
                                                    County Counsel, County of Ventura
18
19                                                                              PDF signature
    Dated: January 27, 2021                  By  *Christine Renshaw*
20                                                  CHRISTINE A. RENSHAW
                                                    Assistant County Counsel
21
22                                              Attorneys for Plaintiffs County of Ventura and
                                                Robert Levin, M.D., in His Capacity as Health
                                                Officer for Ventura County
23
24
25
26
27
28

                                                    vi

1  **MEMORANDUM OF POINTS AND AUTHORITIES**

2      Plaintiffs submit the following memorandum of points and authorities in support of

3  their ex parte application for temporary restraining order and order to show cause re

4  issuance of a preliminary injunction.

5  **I**

6  **INTRODUCTION**

7      Ventura County, like the rest of California and the nation, is still urgently

8  combating a public health emergency caused by the highly contagious and fatal

9  coronavirus disease 2019 ("COVID-19").  While promising vaccines are being produced,

10  it will be months before vaccines are available to everyone.  In the meantime, the virus is

11  raging in Ventura County and across California, which is setting new records for cases

12  and hospitalizations every day.

13      Recognizing the extensive and deadly risks of this novel disease – and especially

14  its ability to overwhelm intensive care unit ("ICU") capacity – the State of California at

15  the outset of the pandemic issued emergency public health orders requiring that non-

16  essential businesses close and that Californians generally stay home except for essential

17  needs.  Since then, the State has revised its orders and guidance several times to reflect

18  the most current information regarding the disease's spread throughout California.

19      Defendants are operating a gym under the name "Anytime Fitness" at 101 North

20  Westlake Boulevard, #100, Westlake Village.  Despite state health orders mandating the

21  closure of indoor gyms, defendants have continuously operated indoor gyms and/or

22  fitness centers since at least November 16, 2020.  The County Health Officer issued

23  closure orders to this business because it was not operating in compliance with state

24  health orders ("Closure Orders").  (Declaration of Robert Levin, M.D. ["Levin Decl."],

25  ¶ 12 and Exh. 1.)  Despite such Closure Orders, defendants continue to defiantly operate

26  their indoor gym and have shown no indication that they intend to come into compliance

27  with state health mandates.  To protect the health and safety of the general public,

28  including all residents of Ventura County, and to avoid further strain on its already

1

1  overwhelmed health care system, the court must issue a temporary restraining order

2  enjoining this dangerous and irresponsible conduct by defendants.

3  ## II

4  ## BACKGROUND FACTS

5  COVID–19 is a novel severe acute respiratory illness that to date has killed a total

6  of 29,701 people in California. ("Tracking COVID-19 in California" (Jan. 10, 2021)

7  <https://covid19.ca.gov/state-dashboard/> [as of Jan. 12, 2021].)  More than 2,670,962

8  people in California have been infected with the virus that causes COVID-19.  (*Id.*)  The

9  virus is easily transmissible and spreads through respiratory droplets that remain in the

10  air, and may be transmitted unwittingly by individuals who exhibit no symptoms.  (See

11  *South Bay United Pentecostal Church v. Newsom* (2020) 140 S.Ct. 1613, 1613 ("*South*

12  *Bay*") (Roberts, C.J., concurring).)  There is no cure and no widely effective treatment.

13  (*Id.*)  Measures that limit physical contact, such as closure of places where people gather

14  and physical distancing, have been "the most effective way to stop COVID-19's spread."

15  (*Best Supplement Guide, LLC v. Newsom* (May 22, 2020, No. 2:20-cv-00965-JAM-CKD)

16  ____U.S.___ [2020 WL 2615022 at *6] ("*Best Supplement Guide*").)

17  The virus continues to spread at a rapid pace, as demonstrated by the continuous rise in

18  the number of persons infected by the disease both locally and nationally.  (Levin Decl.,

19  ¶ 3.)

20  On March 4, 2020, the Governor of the State of California declared a state of

21  emergency in California due to the threat of COVID-19.  (Complaint, ¶ 8.)  The

22  declaration of state of emergency remains in effect.  (*Ibid.*)  On March 12, 2020, the

23  Governor issued Executive Order N-25-20 ordering all state residents to heed any orders

24  and guidance of state and local public health officials with respect to COVID-19.

25  (Request for Judicial Notice ["RJN"], Exh. 1.)

26  On March 12, 2020, the County Health Officer declared that a local health

27  emergency existed in Ventura County.  (Complaint, ¶ 9.)  On March 17, 2020, the County

28  Board of Supervisors adopted a resolution proclaiming that a local emergency and a local

2

health emergency exist in Ventura County due to the COVID-19 pandemic and ratifying the declaration of local health emergency by the County Health Officer.  (*Ibid.*)  The proclamation of local emergency and declaration of local health emergency remain in effect.  (*Ibid.*)  On March 19, 2020, the Governor issued Executive Order N-33-20 again ordering all residents to immediately heed the current state public health directives. (RJN, Exh. 2.)

Over the course of the pandemic, the State has promulgated several further orders tailored to address current information and data regarding the disease's spread throughout California.  On August 28, 2020, the State implemented the currently operative "Blueprint for a Safer Economy" which sets forth a tiered system based upon how prevalent COVID-19 is in each county and the extent of community spread.  (RJN, Exhs. 4 and 5; "Governor Newsom Unveils Blueprint for a Safer Economy, a Statewide, Stringent and Slow Plan for Living with COVID-19" (August 28, 2020) <https://www.gov.ca.gov/2020/08/28/governor-newsom-unveils-blueprint-for-a-safer-eco nomy-a-statewide-stringent-and-slow-plan-for-living-with-covid-19/> [as of January 8, 2021].)  The "Blueprint for a Safer Economy" restricts when sectors and activities may operate indoors and limits how many people may participate based on transmission risk. (*Id.*)  The tiered system consists of four categories:  purple (widespread), red (substantial), orange (moderate) and yellow (minimal).  (*Id.*)  Since November 16, 2020, the County has been classified in the purple tier.  (Levin Decl., ¶ 9.)

Despite these efforts, cases of the virus surged again in November and the acceleration of cases threatened to overwhelm California's hospital system.  (RJN, Exh. 6 [Regional Stay-At-Home Order].)  In an effort to address the surge, the State Public Health Officer issued a Regional Stay-At-Home Order ("Regional Order")[1] on December 3, 2020.  Under the Regional Order, in regions with less than 15 percent ICU availability, private gatherings of any size are prohibited and certain sector operations,

---

[1]  Hereinafter, the Blueprint and the Regional Order shall be referred to collectively as the "Health Orders."

3

1  including gyms, are restricted.  However, gyms and fitness centers may continue to
2  operate outdoors:

3     "Gyms in counties in a region that is impacted by the order
4     must stop indoor operations.  Outdoor gyms meet the essential
5     workforce definition of an outdoor recreational facility for the
6     purpose of facilitating personal health through physically
7     distanced outdoor exercise and may continue operations."
8     (RJN, Exh. 7.)

9     Under the Regional Order, Ventura County falls within the Southern California
10 Region which has been under the order since December 6, 2020.  (Levin Decl., ¶ 9.)
11 Under both the Regional Order and while the Ventura County is classified in the purple
12 tier under the Blueprint for a Safer Economy, gyms and fitness centers in Ventura County
13 – including defendants' facilities – may conduct outdoor operations, with appropriate
14 modifications, but may not conduct indoor operations.  (Levin Decl., ¶ 9; see also RJN,
15 Exh. 7.)

16     Presently, ICU capacity in Ventura County is stretched thin.  (Levin Decl., ¶ 16.)
17 Individuals who would otherwise be transferred to the ICU may be treated in the
18 emergency room due to lack of ICU capacity.  (*Id.*)  ICU capacity in the Southern
19 California Region remains at zero percent.  (Levin Decl., ¶ 11.)  Given this strain on the
20 healthcare system, decision are having to be made regarding how to best ration medical
21 care and supplies.  (Levin Decl., ¶ 16.)  COVID-19 continues to present an imminent and
22 proximate threat to the residents of Ventura County.  (Levin Decl., ¶ 13.)  At this stage of
23 the local health emergency, it is essential to control the spread of COVID-19 as much as
24 possible and prevent Ventura County's already overwhelmed health care system from
25 reaching a point of collapse.  (*Ibid.*)
26 / / /
27 / / /
28 / / /

4

**NOTICE OF AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

### III

### DEFENDANTS' FAILURE AND REFUSAL

### TO COMPLY WITH THE HEALTH ORDERS AND CLOSURE ORDER

Defendants have failed to comply with state health orders issued during the COVID-19 pandemic since the outset and continue to violate such orders to date.  On July 17, 2020,[2/] the County Health Officer issued a closure order to Anytime Fitness - Westlake for operating out of compliance with state health orders (Levin Decl., ¶ 12.) The closure order had no effect on defendants' business operations which they continued to conduct in violation of state health orders and the County Health Officer's closure orders.  (Declaration of Sean Jones ["Jones Decl."], ¶¶ 2-4; Declaration of Anne Guevarra ["Guevarra Decl."], ¶¶ 4-6.)  The City of Thousand Oaks, Code Compliance Division ("TO Code Compliance") has received ongoing complaints regarding the operation of an indoor gym at Anytime Fitness - Westlake both before and after the July 17, 2020, closure order was issued.  (Guevarra Decl., ¶¶ 2-6; Jones Decl., ¶¶ 2-4.)  Since Ventura County was reclassified into the purple tier on November 16, 2020, and then subject to the Regional Order on December 6, 2020, both of which prohibit any indoor operation of gyms and fitness facilities, TO Code Compliance has continued to receive ongoing citizen complaints that defendants are operating indoor gym and fitness facilities at Anytime Fitness - Westlake.  (Jones Decl., ¶¶ 2-4; Guevarra Decl., ¶¶ 4-6.)  In light of those complaints, TO Code Compliance has conducted in person investigations at Anytime Fitness - Westlake on December 8 and 16, 2020, and January 12 and 13, 2021, and observed that the business continues to operate indoor fitness facilities in contravention of the Blueprint and later the Regional Order.  (Jones Decl., ¶ 2-4; Guevarra Decl., ¶¶ 4-6.)

/ / /

/ / /

/ / /

---

[2/]  Indoor fitness operations were also prohibited under the State's COVID-19 health orders preceding the Blueprint.

5

IV

**NOTICE OF APPLICATION**

Pursuant to Rules of Court, rule 3.1204(b)(3), notice of this ex parte application was provided to defendants on January 25, 2021.  (Renshaw Decl., ¶¶ 2-3.)

V

**ARGUMENT**

A.      **Legal Standard for Injunctive Relief**

A preliminary injunction, including a temporary restraining order, "may be granted at any time before judgment upon a verified complaint, or upon affidavits if the complaint in the one case, or the affidavits in the other, show satisfactorily that sufficient grounds exist therefor."  (Code Civ. Proc., § 527, subd. (a).)

The standard for issuing a temporary restraining order or a preliminary injunction involves the weighing of two interrelated factors:  (1) the likelihood that the moving party will prevail on the merits and (2) the relative interim harm to the parties from the issuance or non-issuance of the injunction.  (*White v. Davis* (2003) 30 Cal.4th 528, 554.)  "[T]he more likely it is that plaintiffs will ultimately prevail, the less severe must be the harm that they allege will occur if the injunction does not issue."  (*Right Site Coalition v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 336, 338-339; see also *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 447 [where party seeking injunction makes "sufficiently strong" showing of likelihood of success, court "has discretion to issue the injunction notwithstanding that party's inability to show that the balance of harms tips in his favor"].)

Moreover, "[w]here a government entity seeking to enjoin the alleged violation of an ordinance which specifically provides for injunctive relief established that it is reasonably probable it will prevail on the merits, a rebuttable presumption arises that the potential harm to the public outweighs the potential harm to the defendant."  (*IT Corp v. County of Imperial* (1983) 35 Cal. 3d 63, 72.)  Only if defendants show that they would

/ / /

6

1    suffer grave or irreparable harm from the issuance of the preliminary injunction, must the

2    court then examine the relative actual harms to the parties.  (*Ibid.*)

3         This application is made pursuant to Code of Civil Procedure section 527 on the

4    grounds that:  (i) Plaintiffs are likely to succeed on the merits of their claim seeking

5    compliance with the Health Orders and Closure Orders; (ii) unless a temporary restraining

6    order is issued, Ventura County residents will suffer and continue to suffer irreparable

7    injury from defendants' continued willful disobedience of the Health Orders and Closure

8    Orders; and (iii) the balance of hardships weighs overwhelmingly in plaintiffs' favor.

9    **B.**     **Plaintiffs are Likely to Prevail on the Merits**

10        **1.  Defendants' Operation of Indoor Gym During the Peak of the Pandemic in**

11   **Ventura County Violates the Health Orders, the Closure Orders and California Law**

12        Plaintiffs are likely to prevail on the merits of their claim that defendants have

13   failed and refuse to comply with the Health Orders and Closure Orders in violation of

14   California law and are entitled to injunctive relief.

15        The County Health Officer is appointed by the County Board of Supervisors

16   pursuant to Health and Safety Code section 101000.  The County Health Officer is also

17   the appointed health officer for all cities in Ventura County, including the City of

18   Thousand Oaks, where his duties include the enforcement of "all the laws of the City

19   pertaining to causes of sickness, nuisances, . . . [and] all orders, quarantine regulations,

20   and rules prescribed by the Board of Health of the State."  (RJN, Exh. 9, §§ 2-1.401,

21   2-1.402; see also Levin Decl., ¶ 1.)

22        The County Health Officer is responsible for issuing and enforcing public health

23   orders imposing measures he deems necessary to protect the Ventura County public

24   health from infectious diseases and other health threats during declared state and local

25   emergencies pursuant to Government Code section 8634, Health and Safety Code

26   sections 101040 and 120175, and related state regulations, the relevant portions of which

27   are set forth below:

28   ///

7

**NOTICE OF AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

- Government Code section 8634:

  "During a local emergency the governing body of a political subdivision, or officials designated thereby, may promulgate orders and regulations necessary to provide for the protection of life and property. . . ."

- Health and Safety Code section 101040, subdivisions (a) and (b):

  "The local health officer may take any preventive measure that may be necessary to protect and preserve the public health from any public health hazard during any 'state of war emergency,' 'state of emergency,' or 'local emergency,' as defined by Section 8558 of the Government Code, within his or her jurisdiction. [¶] . . . 'Preventative measure' means abatement, correction, removal or any other protective step that may be taken against any public health hazard that is caused by a disaster and affects the public health."

- Health and Safety Code section 120175:

  "Each health officer knowing or having reason to believe that any case of the diseases made reportable by regulation of the department, or any other contagious, infectious or communicable disease exists, or has recently existed, within the territory under his or her jurisdiction, shall take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases."

- Title 17, California Code of Regulations, section 2501, subdivision (a):

  "Upon receiving a report made pursuant to Section 2500 or 2505 [of title 17 of the California Code of Regulations], the local health officer shall take whatever steps deemed necessary for the investigation and control of the disease, condition or outbreak reported."  (See Cal Code Regs., tit. 17, § 2500, subd. (j) [requiring reports to local health officer of "[n]ovel coronavirus infections"].)

The COVID-19 virus has led to the declaration of state and local emergencies pursuant to Government Code section 8558 and Health and Safety Code section 101080.

8

1  The County Health Officer may therefore promulgate orders as necessary to protect and

2  preserve the public health.  (Gov. Code, § 8634; Health & Saf. Code, § 101040.)  This

3  includes enforcement measures as may be necessary to prevent the spread of disease or

4  the occurrence of additional cases.  (Health & Saf. Code, §§ 101040, 120175; Cal. Code

5  Regs., tit. 17, § 2501.)

6       Compliance with the Health Orders and Closure Orders is mandatory.  (Health &

7  Saf. Code, § 120220.)  Noncompliance constitutes a violation of state law punishable as a

8  misdemeanor.  (Health & Saf. Code, §§ 120295, 131082.)  And the County Health

9  Officer may use civil enforcement as a mechanism to require compliance with public

10  health orders.  (See, e.g., *Levin v. Adalberto* (2007) 156 Cal.App.4th 288 [affirming

11  enforcement of civil order of detention issued by County Health Officer against

12  tuberculosis patient]; see also Health & Saf. Code, §§ 101040, subd. (a) & 120175.)

13       The Health Orders expressly prohibit the operation of indoor gyms and fitness

14  centers at this stage of the pandemic because of the increased risk that such indoor

15  gatherings pose to the transmission of COVID-19.  (Levin Decl., ¶ 16.)  Despite the clear

16  directive of the Health Orders and despite having received Closure Orders from the

17  County Health Officer due to repeated violation of such Health Orders, defendants have

18  repeatedly and continuously operated indoor gym and/or fitness facilities in violation of

19  such orders.  (Jones Decl., ¶¶ 2-4; Guevarra Decl., ¶¶ 2-6.)  It is clear that defendants are

20  operating in violation of the Health Orders and Closure Orders and, thus, are in violation

21  of state law mandating compliance with such orders.

22      **2.  The Health Orders Impose Constitutional Measures to Address a Public**

23  **Health Emergency**

24       It is expected that defendants will argue that the Health Orders violate their

25  constitutional rights, but such arguments are without merit.

26       Ths Supreme Court has long recognized that "a community has the right to protect

27  itself against an epidemic of disease which threatens the safety of its members."

28  (*Jacobsen v. Massachusetts* (1905) 197 U.S. 11, 27 [25 S.Ct. 358] ("*Jacobsen*"); see also

9

1    *Kansas v. Hendricks* (1997) 521 U.S. 346, 356 [117 S.Ct. 2072] [recognizing the

2    continuing validity of *Jacobson*], and *South Bay*, *supra*, 140 S.Ct. at p. 1613 (Roberts,

3    C.J., concurring).)  The Supreme Court has permitted states to enact "quarantine laws and

4    health laws of every description." (*Jacobsen*, *supra*, 197 U.S. at p. 27, internal quotations

5    omitted.)  Although the Constitution is not suspended during a public health emergency,

6    the Supreme Court has held that state governments are entitled to deference, both

7    generally in the management of their state's public health (*Jacobson*, *supra*, 197 U.S. at

8    p. 38),[3/] and specifically in making decisions in areas of scientific uncertainty. (*Marshall*

9    *v. United States* (1974) 414 U.S. 417, 427 [94 S.Ct. 700].)

10         Numerous courts have already rejected constitutional challenges to health orders

11   requiring the closure of gyms and/or fitness centers during the COVID-19 pandemic.

12   (RJN, Ex. 8 [*Best Supplement Guide* order granting motion to dismiss)]; *Best Supplement*

13   *Guide, supra,* 2020 WL 2615022 [order denying request by gym for temporary

14   restraining order]; *League of Independent Fitness Facilities & Trainers, Inc. v. Whitmer*

15   (6th Cir. 2020) 814 Fed.Appx. 125 ("*League of Independent Fitness Facilities &*

16   *Trainers*") [staying district court order that enjoined State's closure of indoor fitness

17   facilities]; *World Gym, Inc. v. Baker* (July 24, 2020, No. 20-cv-11238-DJC) ___U.S.___

18   [WL 4272557] [denying injunctive relief to gyms challenging Governor's executive

19   / / /

20   _____

21   [3/] Mere weeks ago, the Supreme Court embraced the proposition, rooted in
     *Jacobson*, that members of the judiciary "are not public health experts, and [] should
     respect the judgement of those with special expertise in this area." (*Roman Catholic*
22   *Diocese of Brooklyn v. Cuomo* (Nov. 25, 2020, No. 20A87) ___U.S. ____ [WL 6948354,
     at *3].)  Indeed, a majority of the court expressly recognized the deference due states in
23   the management of public health. (*Id.* at *8 (Kavanaugh, J., concurring) ["The
     Constitutional principally entrusts the safety and health of the people to the politically
24   accountable officials of the States," and "[f]ederal courts therefore must afford substantial
     deference to state and local authorities about how best to balance competing polity
25   considerations during the pandemic"] (quoting *South Bay, supra*, 140 S.Ct. at p. 1613)
     (Roberts, C.J., concurring)); *Id.* at *9 (Roberts, C.J., dissenting) (reaffirming position in
26   *South Bay*); *Id.* at *12 (Breyer, J., dissenting) ["courts must grant elected officials broad
     discretion when they undertake to act in areas fraught with medical and scientific
27   uncertainties"]; *Id.* (Sotomayor, J., dissenting) ["Justices of this Court play a deadly
     game second guessing the expert judgment of health officials about the environments in
28   which a contagious virus, now infecting a million Americans each week, spreads most
     easily"].)

10

**NOTICE OF AND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION**

1    order]; *Xponential Fitness v. Arizona* (July 14, 2020, No. CV-20-01310-PHX-DJH)

2    ___U.S. ___ [WL 3971908] [same].)

3        Even under traditional constitutional review, the Health Orders pass constitutional

4    muster.  The Health Orders as applied to gyms and fitness centers do not implicate any

5    suspect classification or fundamental right and therefore they are subject to rational basis

6    scrutiny.  (RJN, Ex. 8, at p. 27 [applying rational basis review and rejecting constitutional

7    claim to California's health orders as applied to gyms]; *Best Supplement Guide*, *supra*,

8    2020 WL 2615022, at *6.)  The Health Orders are temporary restrictions based on an

9    objective, science and data-based analysis of the risk of transmission posed by those

10   activities, which are entitled to deference and easily survive rational basis review.  The

11   Health Orders are rationally related to a legitimate and compelling government interest –

12   namely, protecting the public from a deadly disease.  Gyms operating indoors are

13   particularly risky environments for the transmission of COVID-19.  (Levin Decl., ¶ 14;

14   see RJN, Ex. 8, at 5-6, 19, 30; *League of Independent Fitness Facilities & Trainers,*

15   *supra*, 814 Fed.Appx. at p. 129 ["The idea that heavy breathing and sweating in an

16   enclosed space containing many shared surfaces creates conditions likely to spread the

17   virus is a paradigmatic example of 'rational speculation' that fairly supports the

18   Governor's treatment of indoor fitness facilities"]; *World Gym*, *supra*, 2020 WL 4274557,

19   at *3-4 [upholding closure of gyms under rational basis review]; *Xponential Fitness,*

20   *supra*, 2020 WL 3971908 at *6-7 [same].)  In Ventura County alone, at least one gym has

21   been the source of a COVID-19 outbreak and at least 127 cases of COVID-19 have been

22   traced back to a gym.  (Levin Decl., ¶ 14.)

23       Critically, the Health Orders do not preclude the operation of defendants'

24   businesses – even under the most restrictive tier in the Blueprint or under the Regional

25   Order, gyms are permitted to operate outdoors.  Defendants cannot show that the Health

26   Orders violate any constitutional right.

27   / / /

28   / / /

**C.    Unless Defendants Are Enjoined from Violating the Health Orders, the General Public, Including All Ventura County Residents, Will Suffer Irreparable Harm**

Plaintiffs seek to enforce the Health Orders against defendants to protect the public health of the citizens in the community, prevent additional, unnecessary strain on an already overburdened healthcare system, and ameliorate or avoid continued and further restrictions on businesses and other operations and activities within Ventura County. The primary purpose of a temporary restraining order is to preserve the status quo and avoid irreparable harm. (*Dodge, Warren & Peters Ins. Servs., Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1418.) Irreparable harm includes harms arising from wrongs of "continuing character" and wrongs that cannot be righted through monetary compensation. (*People ex rel. Gow v. Mitchell Brothers' Santa Ana Theater* (1981) 118 Cal.App.3d 863, 870-871; *Wind v. Herbert* (1960) 186 Cal.App.2d 276, 285.)

Defendants' ongoing refusal to comply with the Health Orders jeopardizes the success of state and local efforts to control and contain the spread of COVID-19, thereby placing the health and safety of all residents in Ventura County at heightened risk of infection and also at heightened risk that an overwhelmed medical system will not be able to care for their healthcare needs. They also are likely to result in continued and further restrictions on businesses and other operations and activities within Ventura County, detrimentally affecting the quality of life of the entire community. Such harms are irreparable and cannot be constrained absent the requested restraining order in light of defendants' knowing and repeated failure and refusal to comply with the Health Orders.

**D.    The Balance of the Equities Weighs Overwhelmingly in Plaintiffs' Favor**

As explained above, the Health Orders were issued to prevent a clear and present danger of harm, namely, the spread of COVID-19 between individuals exercising indoors and, subsequently, to the general public. Plaintiffs acknowledge that the Health Orders present a temporary restriction on defendants' ability to operate their business indoors;

/ / /

12

1    however they are still permitted to operate outdoors even while the most restrictive rules

2    are in effect.

3         On the other side of the balance of equities, Ventura County is experiencing an

4    unprecedented surge in the number of COVID-19 cases and deaths.  The Ventura County

5    healthcare system is presently under extreme strain at the present moment.  ("'Like a war

6    zone':  ICU beds expanded, body bags in play as Oxnard hospital faces surge.'"  (Jan. 9,

7    2020)

8    <https://www.vcstar.com/story/news/local/2021/01/09/covid-19-surge-strains-oxnard-hos

9    pital-bringing-pleas-slow-spread-coronavirus-california/4105120001/> [as of Jan. 11,

10   2021] ["Every bed in the ICU at St. John's Regional Medical Center is full most of the

11   time as the COVID-19 surge rages forward.  If a bed is open, nurses said, it often means a

12   patient died"].)  The Health Orders are a critical part of the state and local effort to

13   prevent the further spread of a deadly disease, to protect the health and safety of residents

14   from exposure, illness and possibly death, and to avoid further overwhelming the

15   healthcare system at a time of increasing rates of infection.  Health officials have

16   determined that indoor gatherings, such as those facilitated by defendants' indoor gym

17   operations, where people come together from a multitude of different households and

18   remain in close proximity for extended periods of time, while engaging in activities such

19   as exercising, lifting weights, running, breathing heavily, sweating and touching

20   numerous shared surfaces, and where ventilation is limited, pose a particularly high risk

21   of disease transmission.  (Levin Decl., ¶ 14.)

22        Comparing the harm to defendants if injunctive relief is granted – they must

23   conduct their business outdoors – to the harm to the general public, including all Ventura

24   County residents, if relief is not granted – including the risk of maxing out the ICU

25   capacity in Ventura County and precluding the availability of lifesaving treatments to

26   patients who need such level of care – the balance of the equities weighs heavily in

27   plaintiffs' favor.

28   ///

13

1

## VI

2

## CONCLUSION

3      Based on the foregoing, plaintiffs respectfully request that the court grant the

4 requested injunctive relief.

5                                          MICHAEL G. WALKER
                                          County Counsel, County of Ventura
6

7 Dated:___January 27, 2021___      By _*Christine Renshaw*_     PDF signature
                                          CHRISTINE RENSHAW
8                                          Assistant County Counsel

9                                          Attorneys for Plaintiffs County of Ventura
                                          and Robert Levin, M.D., in His Capacity as
10                                         Health Officer for Ventura County

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

1   MICHAEL G. WALKER. State Bar No. 150554
    County Counsel, County of Ventura
2   JACLYN SMITH, State Bar No. 274311
    Assistant County Counsel
3   CHRISTINE RENSHAW, State Bar No. 249618
    Assistant County Counsel
4   BRETT B. McMURDO, State Bar No. 293050
    Assistant County Counsel
5   800 South Victoria Avenue, L/C #1830
    Ventura, California 93009
6   Telephone:   (805) 654-2580
    Facsimile:   (805) 654-2185
7   E-mail:      jaclyn.smith@ventura.org

8   Attorneys for Plaintiffs County of Ventura
    and Robert Levin, M.D., in His Capacity as
9   Health Officer for Ventura County

VENTURA
SUPERIOR COURT
FILED

JAN 27 2021

MICHAEL D. PLANET
Executive Officer and Clerk
BY:_____, Deputy
JEANETTE FIMBRES

**(EXEMPT FROM FILING**
**FEES [Gov. Code, § 6103].)**

10

11              SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

12

13   COUNTY OF VENTURA and ROBERT )   No. 56-2021-00549550-CU-MC-VTA
     LEVIN, M.D., in his capacity as Health )
14   Officer for Ventura County,           )   Reservation No. 2548913
                                           )
15                  Plaintiffs,            )   DECLARATION OF ANNE
                                           )   GUEVARRA IN SUPPORT OF EX
16         vs.                             )   PARTE APPLICATION FOR
                                           )   TEMPORARY RESTRAINING ORDER
17   WESTLAKE FITNESS LLC; ART             )   AND ORDER TO SHOW CAUSE RE
     GILFUS; and DOES 1-1000, inclusive,   )   ISSUANCE OF PRELIMINARY
18                                         )   INJUNCTION
                  Defendants.             )
19                                        )   Date:    January 28, 2021
                                          )   Time:    8:30 a.m.
20                                        )   Ctrm:    40
                                          )
21   _____)   Judge: Hon. Judge Mark Borrell
                                             Complaint filed: 1/19/2021
22

23         I, Anne Guevarra, state as follows:

24         1.  I am employed with the City of Thousand Oaks ("City") as a Code Compliance

25   Officer since May 2019.  My duties in that assignment include, but are not limited to,

26   working with the Ventura County Office of Emergency Services ("OES") to monitor and

27   enforce compliance with state and local health orders issued during the COVID-19

28   / / /

1

**DECLARATION OF ANNE GUEVARRA ISO EX PARTE APPLICATION FOR TEMPORARY**
**RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

1  pandemic.  I have personal knowledge of the facts stated herein and, if called as a
2  witness, I could and would competently testify thereto.

3      2.  In response to multiple complaints of continued indoor gym operations at
4  Anytime Fitness located at 101 North Westlake Boulevard, #100, Westlake Village,
5  California  ("Gym"), on July 17, 2020, I went to this location to advise the Gym that it
6  was in violation of current health orders which prohibit indoor operation of gyms and
7  fitness facilities.  I spoke with the Gym's Executive Director, Dulcy Sturtevant
8  ("Sturtevant"), who advised me that she and the owner, Art Gilfus ("Gilfus"), are aware
9  of the current health orders prohibiting indoor operation of gyms and fitness facilities.
10 Sturtevant also  advised me that Gilfus decided that the Gym will continue operating with
11 no intentions of shutting down.

12     3.  On July 17, 2020, the Health Officer for Ventura County issued a
13 closure order to Gym.  The closure order requires Gym to immediately cease all business
14 activities at its location.

15     4.  In response to ongoing complaints of continued indoor gym operations at the
16 Gym, on December 8, 2020, I conducted a compliance observation at the Gym.  I
17 observed several patrons dressed in gym attire enter and exit the gym facilities during my
18 observation.  I also left a copy of the current health orders under the front door of the
19 Gym because the door was locked.

20     5.  Due to ongoing complaints of indoor gym services continuing at the Gym,
21 on January 12, 2021, I conducted a site inspection at the Gym.  I again spoke with
22 Sturtevant and informed her that we had received complaints about ongoing indoor gym
23 operations at this location.  I asked Sturtevant for permission to enter the Gym.
24 Sturtevant stated that she would need to speak with Gilfus first.  I waited for
25 approximately five minutes before Gilfus came outside to speak with me.  Gilfus was
26 visibly upset with my presence.  However, Gilfus allowed me inside the Gym for an
27 inspection.  Upon entering the Gym, I noticed three individuals sitting in the front lobby.
28 ///

2

1  Gilfus told me that the three individuals were trainers.  I did not observe any other

2  persons inside the Gym at this time.

3       6. On January 13, 2021, I conducted a follow up compliance inspection at the

4  Gym with Sean Jones ("Jones").  During this inspection, I observed patrons at the front

5  entrance to the Gym while Jones observed patrons at the rear entrance to the Gym.  I

6  observed a total of eleven people dressed in gym attire enter and exit the gym facilities

7  during my observation.

8       I declare under penalty of perjury under the laws of the State of California that the

9  foregoing is true and correct.

10

11  Dated:  1/21/2021                                ANNE GUEVARRA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1   MICHAEL G. WALKER. State Bar No. 150554
    County Counsel, County of Ventura
2   JACLYN SMITH, State Bar No. 274311
    Assistant County Counsel
3   CHRISTINE RENSHAW, State Bar No. 249618
    Assistant County Counsel
4   BRETT B. McMURDO, State Bar No. 293050
    Assistant County Counsel
5   800 South Victoria Avenue, L/C #1830
    Ventura, California 93009
6   Telephone:   (805) 654-2580
    Facsimile:   (805) 654-2185
7   E-mail:      jaclyn.smith@ventura.org

8   Attorneys for Plaintiffs County of Ventura
    and Robert Levin, M.D., in His Capacity as
9   Health Officer for Ventura County

VENTURA
SUPERIOR COURT
**FILED**

JAN 2 7 2021

MICHAEL D. PLANET
Executive Officer and Clerk
BY:_____, Deputy

**JEANETTE FIMBRES**

**(EXEMPT FROM FILING
FEES [Gov. Code, § 6103].)**

10

11              SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

12

13   COUNTY OF VENTURA and ROBERT       )   No. 56-2021-00549550-CU-MC-VTA
     LEVIN, M.D., in his capacity as Health )
14   Officer for Ventura County,          )   Reservation No. 2548913
                                          )
15                     Plaintiffs,        )   DECLARATION OF SEAN JONES IN
                                          )   SUPPORT OF EX PARTE
16          vs.                           )   APPLICATION FOR TEMPORARY
                                          )   RESTRAINING ORDER AND ORDER
17   WESTLAKE FITNESS LLC; ART            )   TO SHOW CAUSE RE ISSUANCE OF
     GILFUS; and DOES 1-1000, inclusive,  )   PRELIMINARY INJUNCTION
18                                        )
                       Defendants.        )   Date:    January 28, 2021
19                                        )   Time:    8:30 a.m.
                                          )   Ctrm:    40
20                                        )
                                          )   Judge:  Hon. Mark Borrell
21                                        )   Complaint filed: 1/19/2021
                                          )
22   _____)

23          I, Sean Jones, state as follows:

24          1.  I am employed with the City of Thousand Oaks ("City").  In August 2020, I

25   was reassigned to the City's Code Compliance Division for assistance with the City's

26   COVID-19 oversight and enforcement work.  My duties in that assignment include, but

27   are not limited to, working with the Ventura County Office of Emergency Services

28   ("OES") to monitor and enforce compliance with state and local health orders issued

                                          1

1  during the COVID-19 pandemic.  I have personal knowledge of the facts stated herein

2  and, if called as a witness, I could and would competently testify thereto.

3      2. In response to multiple complaints of continued indoor gym operations at

4  Anytime Fitness located at 101 North Westlake Boulevard, #100, Westlake Village,

5  California  ("Gym"), on December 16, 2020, I conducted a compliance observation at the

6  Gym.  I observed a total of eight patrons dressed in gym attire enter and exit the gym

7  facilities during the approximately forty minutes of my observation.

8      3. Due to ongoing complaints of indoor gym services continuing at the Gym,

9  on January 12, 2021, I conducted a site inspection at the Gym.  I observed several patrons

10  dressed in gym attire enter and exit the gym facilities during my observation.

11      4. On January 13, 2021, I conducted a follow up compliance inspection at the

12  Gym with fellow Compliance Officer Anne Guevarra ("Guevarra").  During this

13  inspection, I observed patrons at the rear entrance to the Gym while Guevarra observed

14  patrons at the front entrance to the Gym.  I observed a total of eleven people dressed in

15  gym attire enter and exit the gym facilities during my observation.  I observed multiple

16  patrons dressed in gym attire enter and exit the gym facilities from the rear entrance

17  during my inspection.

18      I declare under penalty of perjury under the laws of the State of California that the

19  foregoing is true and correct.

20

21  Dated: 01/21/2021                             SEAN JONES

22

23

24

25

26

27

28

2

# ATTACHMENT 2

Ronda N. Baldwin-Kennedy, Esq.,  SBN: 302813
**Law Office of Ronda Baldwin-Kennedy**
5627 Kanan Rd, Suite 614
Agoura Hills, CA 91301-3358
Telephone: 951-268-8977 / Fax: 702-974-0147

Attorney for Defendants, **WESTLAKE FITNESS LLC and ART GILFUS**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN THE COUNTY OF VENTURA

| | |
|---|---|
| **COUNTY OF VENTURA and ROBERT LEVIN, M.D., in his capacity as Health Officer for Ventura County,**<br><br>Plaintiffs,<br><br>vs.<br><br>**WESTLAKE FITNESS LLC;ART GILFUS and DOES 1-1000, inclusive,**<br><br>Defendants. | CASE NO.: 56-2021-00549550-CU-MC-VTA<br><br>**OPPOSITION TO EX PARTE APPLICATIN FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CASUSE RE ISSUANCE OF PRELIMINARY INJUCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONDA N. BALDWIN-KENNEDY IN SUPPORT OF OPPOSITION THISEOF.** |

      **TO PLAINTIFFS COUNTY OF VENTURA** and **ROBERT LEVIN, M.D.,** in his

capacity as Health Officer for Ventura County ("Plaintiffs") and its **ATTORNEY OF**

**RECORD:**

      **WESTLAKE FITNESS LLC** and **ART GILFUS** ("Defendants") herein submits its

Opposition to Plaintiffs Ex Parte Application for Temporary

Restraining Order and Order to Show Cause Re Issuance of Preliminary Injunction.

      The Opposition shall be based on this Opposition, the attached Memorandum of Points

and Authorities, the Declaration of Ronda Baldwin-Kennedy, concurrently filed and served, on the complete files and records of this action and on such to her oral and/or documentary evidence as may be presented at the hearing on the Motion.

Date: January 27, 2021                    Law Office of Ronda Baldwin-Kennedy

                                          By: *Ronda Baldwin-Kennedy Esq.*
                                          Ronda Baldwin-Kennedy
                                          Attorneys for Plaintiff.

## I.
## MEMORANDUM OF POINTS AND AUTHORITIES
## STATEMENT OF FACTS

1. The COVID-19 pandemic and its initial spread in the United States and California represented an extraordinary challenge for the citizens of California and its elected representatives. Initial projections based on some models projected widespread infection of the population that would overwhelm our hospitals and healthcare systems, resulting in a massive number of deaths. One model from the CDC projected between 160 to 214 million infections and between 200,000 to 1.7 million deaths nationwide.

2. No one disputes that, in March 2020, faced with these devastating projections, this was a need that called for swift executive action within the bounds of controlling constitutions and established law.

3. Many decisions made in immediate response to protect against the COVID-19 threat and the dire, potential public health crisis resulted in severe restrictions on the rights and liberties of both private individuals and businesses. California was no exception.

4. Since early March 2020, California Governor Gavin Newsom ("Newsom") has taken unprecedented, unilateral executive actions in an effort to address the spread of the virus that causes COVID-19—declaring a state of emergency in the State of California and justifying his restriction on rights and liberties based on the very important goal to "flatten the curve" and avoid overwhelming California's healthcare system and hospitals.

5. During a press conference, Governor Newsom acknowledged that the curve has flattened some.

6. Despite the flattening of the curve and businesses' extraordinary efforts to reopen safely, the Governor has continued to use sweeping, unilateral power to implement severe restrictions that have not been vetted through the usual legislative and administrative processes or subjected to the checks and balances that characterize our order of government.

7. Executive Order was issued by Governor Newsom and went into effect immediately. Governor has continued to use sweeping, unilateral power to implement severe restrictions that have not been vetted through the usual legislative and administrative processes or subjected to the checks and balances that characterize our order of government. Paired with Executive Order imposes extensive requirements upon "all businesses across the state" of California , primarily requiring substantial modifications of workplace environments and protocols with the goal of minimizing the transmission of COVID-19 in the workplace and businesses.

8. Importantly, Executive Order asserts that the rules unilaterally issued by Governor Newsom in Executive Order "have the force and effect" of a regulation that has gone through the formal notice-and-comment procedure mandated by the Administrative Procedures Act; that they "are fully enforceable" by the agencies "with responsibility for overseeing compliance with workplace health-and-safety standards;" and that a violation of Executive Order is a per se violation of the

9. In Executive Directive, the Governor stated his intent that "businesses must do their part to guarantee that the resumption of activities does not contribute to the virus's spread . . ." While Defendants fully support the implementation of reasonable safety measures to ensure the health and well-being of their employees and customers, in issuing Executive Orders the Governor effectively circumvented the proper legislative and administrative procedures.

10. The Governor's overreach will not be cabined any time soon without the Court's intervention. In the Governor's view, California will not emerge from the shut-down and related restrictions in the near future. From the Governor's perspective, California enters the sixth "Post-pandemic" phase only once the state has achieved "sufficient community immunity" and these are "high uptake of an effective therapy or vaccine." The mumps vaccine holds the record for the fastest ever approved vaccine—with development and approval in 4 years.

11. Newsom's MI Safe Start Plan also warns that at any time, "it is also possible to move backwards" and reenter earlier phases of the emergency "if risk increases and if we stop adhering to safe practices." This is a real possibility that Governor Newsom continues for many months, if not years, to enact measures that burden the rights and liberties of individuals and businesses without legislative or administrative input. California is under an unlawfully re-declared state of emergency, with the Executive Branch.   California is under an unlawfully re-declared state of emergency, with the Executive Branch dictating the law, and there is no end in sight. Therefore business are going out of business and this Taking by the Governor Newsom enact measures that burden the rights and liberties of individuals and businesses without legislative or administrative input.

## II.

## LEGAL ARGUMENT

### *Legal Standard*

12. Parties seeking a temporary restraining order must establish (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  Winter v.

Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); see also Stuhlbarg Intern Sales Co., Inc. v. John D. Brush and Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

13. In the Ninth Circuit, courts may also issue temporary restraining orders when there are "serious questions going to the merits" and a "balance of hardships that tips sharply towards the defendant" so long as the remaining two Winter factors are present.  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). When applying either test, courts operate with the understanding that a temporary restraining order, much like a preliminary injunction, is an "extraordinary and drastic remedy." Cf.  Munaf v. Geren, 553 U.S. 674, 690, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008). "The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury [ ] that must be imminent in nature."  Gish, No. EDCV 20-755-JGB( ), 2020 WL 1979970, at *3 (April 23, 2020) (citing Simula, Inc. v. Autoliv, Inc., 175 F.3d. 716, 725 (9th Cir. 1999);  Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

14. The Court first must finds that the State and County gym closures bear a real and substantial relation to public health. In reaching a conclusion, the Court can disagree with Plaintiffs' contention that the State and County orders are simply too far reaching to bear a substantial relation to public health.

15. Plaintiffs wholly fail to grapple with the possibility that the health of their neighbors is a symptom of the stay at home orders, rather than evidence that the restrictions aren't needed. Just like the current restrictions on in-person church services and in-person protests, the gym closures required by the State and County orders plainly bear a real and substantial relation to public health. See Givens, 2020 WL 2307224, at *4; Cross Culture Christian Ctr., 2020 WL

2121111, at *4.Roberts v. U.S. Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Parties may only bring an expressive-association claim under the First Amendment if they demonstrate that they are asserting their right to associate "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Id. Plaintiffs contend that "[w]hen Fitness System and Defendant's staff and customers interact, they engage in expressive association and the advancement of shared beliefs." They do not, however, cite any cases to support the idea that the freedom to associate is designed to protect this type of non-expressive, commercial interaction. Just like the freedom of speech, the rights conferred by the freedoms of assembly and association do not guard against the grievances Defendants opposition.

## II.

## THE FIRST AMENDMENT PROTECTS

### *Freedom of Speech, Assembly, and Expressive Association*

16. The First Amendment protects individuals from undue interference with their freedom of speech, assembly, and expressive association. U.S. CONST., amend. I;  De Jonge v. Oregon, 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937). Plaintiffs argue the State and County gym closures unlawfully infringe upon each of these freedoms. TRO at 14-15. The Court disagrees.

17. The First Amendment's free speech clause "affords protection to symbolic or expressive conduct [and] actual speech."  Virginia v. Black, 538 U.S. 343, 358, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003).   As Defendants argue, the State and County gym closures plainly restrict non-expressive conduct: operating gyms. The Court lacks any authority for the proposition that operating a gym implicates the First Amendment's free speech protections. State

Opp'n at 12; Local Opp'n at 12; see also  United State v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech whenever the person engaging in the conduct intends thereby to express an idea.").

18. Plaintiffs are therefore unlikely to succeed on the merits of this claim. They also fail to raise serious questions going to the claim's merits. Defendant is likely to succeed on the merits of the freedom of assembly or freedom of association claims. Today, the freedom of association and freedom of assembly are largely viewed as one. See  Roberts v. U.S. Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) the proceedings.

19. To obtain the preliminary relief under the Jacobson framework, Defendants must either show (1) they are likely to succeed on the merits of their claim that the State and County gym closures are beyond all question an invasion of their fundamental rights, or (2) there are serious question going to the merits of whether the State and County gym closures are beyond all question an invasion of their fundamental rights. This Court not find that the State and County orders violate "beyond all question" a right that is not yet known to exist. Plaintiffs are unlikely to succeed on this claim and have failed to raise serious questions going to its merits.

### III.

### FOURTEENTH AMENDMENT

*Due Process*

20. The Due Process Clause contained in the Fourteenth Amendment contains both a procedural and substantive component.  Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997). "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property interests within the meaning of the Due Process clause."

Mathews v. Eldridge, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). "A liberty interest may arise from the Constitution itself ... or it may arise from an expectation or interest created by state laws or policies.  Wilkinson v. Austin, 545 U.S. 209, 222, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (citing  Wolff v. McDonnell, 418 U.S. 539, 556-558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Substantive due process, on the other hand, "forbids the government from depriving a person of life, liberty, or property in such a way that ... interferes with rights implicit in the concept of ordered liberty"—regardless of what type of process is first given.  Engquist v. Oregon Dept. of Agric., 478 F.3d 985, 996 (9th Cir 2007).

21. Defendants argue that State and County officials should have afforded them some sort of legal process prior to enacting and threatening to enforce their stay at home orders.

## IV.

## CALIFORNIA CONSTITUTION

### *Right to Liberty*

22. Finally, Defendants contend that the State and County stay at home orders violate their right to liberty under Article I, Section 1 of the California Constitution. As an initial matter, Defendants' state constitutional claim against state officials in their official capacity is barred by the Eleventh Amendment.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (finding the  Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) and   Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) exceptions to Eleventh Amendment immunity inapplicable in a suit against state officials on the basis of state law).

23. Defendants argue they are nonetheless likely to succeed on their Article 1, Section 1 claim against the Plaintiffs because public health officials may not exercise their quarantine

9

OPPOSITION TO EX PARTE APPLICATIN FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CASUSE RE ISSUANCE OF PRELIMINARY INJUCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONDA N. BALDWIN-KENNEDY IN SUPPORT OF OPPOSITION THEREOF

powers absent "reasonable grounds [ ] to support the belief that the person so held is infected."

TRO at 22 (quoting Ex Parte Martin, 83 Cal. App. 2d 164, 167, 188 P.2d 287 (1948)).

Defendants also cite Jew Ho v. Williamson, 103 F. 10 (C.C.N.D. Cal. 1900), where the

California court found that sealing off an entire section of San Francisco to prevent the spread of

the bubonic plague was "unreasonable, unjust, and oppressive." Id. at 26. Both cases

Defendants rely upon are easily distinguishable and of little precedential value to this Court. Ex

Parte Martin involved the quarantine of two individuals in jail after passing through a place of

prostitution, and Jew Ho involved a racially-motivated and scientifically-unfounded quarantine

of San Francisco's Chinatown. See Ex Parte Martin, 83 Cal. App. 2d at 166, 188 P.2d 287 are

exacting. But they are also temporary, rooted in science, and proportional to the threat COVID-

19 poses. It bears repeating: these restrictions are temporary. Governor Newsom and County

officials have made it clear gyms and other similarly-situated venues will reopen as soon as it is

safe. Relying upon scientifically-backed opinions of their public health experts, these officials

have concluded it is not safe to reopen yet. This conclusion reflects these elected officials' best

efforts to balance the interests in promoting public health with those in ensuring economic

stability is unlawful.

## V.

## CONCLUSION

Based on the foregoing, Defendants respectfully requests that this Court deny Plaintiffs

Ex Parte Application for Temporary Restraining Order and Order to Show Cause Re Issuance of

Preliminary Injunction.

////

////

10

OPPOSITION TO EX PARTE APPLICATIN FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CASUSE RE
ISSUANCE OF PRELIMINARY INJUCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONDA
N. BALDWIN-KENNEDY IN SUPPORT OF OPPOSITION THEREOF

1

2   Date: January 27, 2021                    Law Office of Ronda Baldwin-Kennedy

3
                                              By: *Ronda Baldwin-Kennedy Esq.*
4                                                 Ronda Baldwin-Kennedy
5                                                 Attorneys for Defendants.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**OPPOSITION TO EX PARTE APPLICATIN FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CASUSE RE ISSUANCE OF PRELIMINARY INJUCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONDA N. BALDWIN-KENNEDY IN SUPPORT OF OPPOSITION THEREOF**

I, **RONDA N. BALDWIN-KENNEDY**, do hereby declare that all of the following is true and correct to the best of my personal knowledge and if called upon as a witness I could and would competently testify to the truthfulness of all of the below statements.

24. The COVID-19 pandemic and its initial spread in the United States and California represented an extraordinary challenge for the citizens of California and its elected representatives. Initial projections based on some models projected widespread infection of the population that would overwhelm our hospitals and healthcare systems, resulting in a massive number of deaths. One model from the CDC projected between 160 to 214 million infections and between 200,000 to 1.7 million deaths nationwide.

25. No one disputes that, in March 2020, faced with these devastating projections, this was a need that called for swift executive action within the bounds of controlling constitutions and established law.

26. Many decisions made in immediate response to protect against the COVID-19 threat and the dire, potential public health crisis resulted in severe restrictions on the rights and liberties of both private individuals and businesses. California was no exception. Since early March 2020, California Governor Gavin Newsom ("Newsom") has taken unprecedented, unilateral executive actions in an effort to address the spread of the virus that causes COVID-19—declaring a state of emergency in the State of California and justifying his restriction on rights and liberties based on the very important goal to "flatten the curve" and avoid overwhelming California's healthcare system and hospitals.  During a press conference, Governor Newsom acknowledged that the curve has flattened some.

27. Despite the flattening of the curve and businesses' extraordinary efforts to reopen safely, the Governor has continued to use sweeping, unilateral power to implement severe

restrictions that have not been vetted through the usual legislative and administrative processes or subjected to the checks and balances that characterize the order of government.

28. Executive Order was issued by Governor Newsom and went into effect immediately. Governor has continued to use sweeping, unilateral power to implement severe restrictions that have not been vetted through the usual legislative and administrative processes or subjected to the checks and balances that characterize our order of government. Paired with Executive Order imposes extensive requirements upon "all businesses across the state" of California , primarily requiring substantial modifications of workplace environments and protocols with the goal of minimizing the transmission of COVID-19 in the workplace and businesses.

29. Importantly, Executive Order asserts that the rules unilaterally issued by Governor Newsom in Executive Order "have the force and effect" of a regulation that has gone through the formal notice-and-comment procedure mandated by the Administrative Procedures Act; that they "are fully enforceable" by the agencies "with responsibility for overseeing compliance with workplace health-and-safety standards;" and that a violation of Executive Order is a per se violation of the

30. In Executive Directive, the Governor stated his intent that "businesses must do their part to guarantee that the resumption of activities does not contribute to the virus's spread . . ." While the Defendants fully support the implementation of reasonable safety measures to ensure the health and well-being of their employees and customers, in issuing Executive Orders the Governor effectively circumvented the proper legislative and administrative procedures.

31. The Governor's overreach will not be cabined any time soon without the Court's intervention. In the Governor's view, California will not emerge from the shut-down and related restrictions in the near future. From the Governor's perspective, California enters the sixth "Post-

pandemic" phase only once the state has achieved "sufficient community immunity" and these are "high uptake of an effective therapy or vaccine." The mumps vaccine holds the record for the fastest ever approved vaccine—with development and approval in 4 years.

32. Governor Newsom's MI Safe Start Plan also warns that at any time, "it is also possible to move backwards"—and reenter earlier phases of the emergency—"if risk increases and if we stop adhering to safe practices." This is a real possibility that Governor Newsom continues for many months, if not years, to enact measures that burden the rights and liberties of individuals and businesses without legislative or administrative input. California is under an unlawfully re-declared state of emergency, with the Executive Branch.   California is under an unlawfully declared state of emergency, with the Executive Branch dictating the law, and there is no end in sight. Therefore, businesses are going out of business and this Taking by the Governor Newsom enacts measures that burden the rights and liberties of individuals and businesses without legislative or administrative input.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Date: January 27, 2021                    Law Office of Ronda Baldwin-Kennedy


By: *Ronda Baldwin-Kennedy Esq.*
     Ronda Baldwin-Kennedy Esq.
     Attorneys for Defendants.

## CERTIFICATE OF SERVICE

I, the undersigned whose address appears below, certify:

That I am, and at all times hereinafter mentioned, more than 18 years of age; my business address is located in the County of Riverside, State of California, and am not a party within the proceeding;

That on the 27th day of January 2021, I served a true copy of the within:

**OPPOSITION TO EX PARTE APPLICATIN FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CASUSE RE ISSUANCE OF PRELIMINARY INJUCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF RONDA N. BALDWIN-KENNEDY IN SUPPORT OF OPPOSITION THISEOF.**

By E-Mail jaclyn.smith@ventura.org  and Facsimile: (805) 654-2 I 85 addressed to the following person:

MICHAEL G. WALKER, Attorney for Plaintiffs
County Counsel. County of Ventura
JACLYN SMITI
Assistant County Counsel
CHRISTINE RENSHAW,
Assistant County Counsel
BRETT B. McMURDO,
Assistant County Counsel
800 South Victoria Avenue, LIC#1830
Ventura, California 93009

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  January 27, 2021          *Brenda Mason*
                                 Brenda Mason